UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------- X
TRIREME ENERGY HOLDINGS, INC.;
AND TRIREME ENERGY
DEVELOPMENT, LLC,

        Plaintiffs,

  -against-

INNOGY RENEWABLES US LLC; AND
CASSADAGA WIND LLC,

        Defendants.

---------------------------------------------------------- X

CIVIL ACTION NO.

**COMPLAINT**

Plaintiffs Trireme Energy Holdings, Inc. and Trireme Energy Development, LLC (collectively, "Trireme" or "Plaintiffs") complain and allege as follows against Defendants Innogy Renewables US LLC ("Innogy") and Cassadaga Wind LLC (collectively, "Defendants").

## NATURE OF THE ACTION

1. This is an action for breach of contract arising from Defendant Innogy's breach of multiple provisions of a commercial contract with Plaintiffs in which Innogy agreed to exercise commercially reasonable efforts to develop several energy projects, including a large wind energy project in Chautauqua County, New York, and further agreed to make certain payments to Plaintiff Trireme Energy Development, LLC in the course of developing such projects. Plaintiffs also bring this action against Defendant Cassadaga Wind LLC for tortious interference with the contract between Plaintiffs and Innogy.

2. Plaintiff Trireme Energy Holdings, Inc. is the former owner of EverPower Wind Holdings, Inc. ("EverPower"), a renewable energy company founded in 2002 by James "Jim" Spencer. Prior to the agreement that is the subject of this action, EverPower developed, owned,

and operated large-scale wind farms throughout the United States.

3. In December 2017, through an Agreement and Plan of Merger (the "Merger Agreement"), EverPower's wind energy development pipeline was sold to Innogy, a U.S. subsidiary of the European energy company Innogy SE, headquartered in Essen, Germany. As a result of the Merger Agreement, Innogy acquired the rights to develop (among other projects) EverPower's planned wind energy facility in Chautauqua County, New York, named the "Cassadaga Project."

4. The legal entity created to develop the Cassadaga Project is Cassadaga Wind LLC, which is identified as one of several "Project LLC(s)" in Schedule 1.1(f) of the Merger Agreement. As a result of the Merger Agreement, ownership of Cassadaga Wind LLC passed to Innogy, together with the Project LLCs for EverPower's other development projects.

5. The Cassadaga Project involves the construction and operation of 37 large wind turbines over approximately 40,000 acres of agricultural and recreational land to generate up to 125.5 megawatts of electricity, enough to power over 51,000 homes in the Chautauqua County region.

6. Pursuant to the terms of the Merger Agreement, Innogy agreed to use "commercially reasonable efforts" to develop the Cassadaga Project and other projects included in the Merger Agreement.

7. As part of the Merger Agreement, Innogy also agreed to pay Trireme Energy Development, LLC a "Payment Milestone Amount" of $69,700,000 (subject to adjustment as set forth in the Merger Agreement) in connection with developing the Cassadaga Project.

8. Innogy failed to use commercially reasonable efforts to develop the Cassadaga Project. Instead, Innogy intentionally and unreasonably delayed development of the Cassadaga

Project in order to avoid meeting certain development milestones by October 1, 2019. In particular, Innogy intentionally, unreasonably, and unnecessarily delayed the process of securing a permit from the United States Army Corps of Engineers required under Section 404 of the Clean Water Act relating to the mitigation of development projects on streams and wetlands.

9. Innogy intentionally, unreasonably, and unnecessarily delayed development of the Cassadaga Project in order to avoid paying the $69,700,000 Payment Milestone Amount that it was required to pay to Trireme Energy Development, LLC pursuant to the Merger Agreement.

10. By failing to use commercially reasonable efforts to develop the Cassadaga Project, Innogy has breached the Merger Agreement.

11. Innogy also breached a separate provision of the Merger Agreement by failing to reasonably cooperate with multiple requests from James Spencer, CEO of Trireme Energy Development, LLC, concerning the progress of the Cassadaga Project, as required by the Merger Agreement.

12. On information and belief, Innogy also intends to continue delaying the development of the Cassadaga Project in order to prevent the Cassadaga Project from reaching its Commercial Operation Date by December 31, 2020, an event that would also trigger Innogy's obligation to pay Trireme Energy Development, LLC the Payment Milestone Amount of $69,700,000.

13. On information and belief, as the designated "Project LLC" for the Cassadaga Project, Cassadaga Wind LLC has tortiously interfered with the Merger Agreement by intentionally delaying the Project to prevent Trireme from receiving the Payment Milestone Amount.

14. Innogy's multiple breaches of the Merger Agreement, and Cassadaga Wind LLC's

tortious interference with the Merger Agreement, have injured Plaintiffs and entitle Plaintiffs to immediate payment of the Payment Milestone Amount and other remedies as set forth below.

## THE PARTIES

15. Plaintiff Trireme Energy Holdings, Inc. is a corporation organized under the laws of Delaware. It has its principal place of business in Pittsburgh, PA.

16. Plaintiff Trireme Energy Development, LLC is a limited liability company organized under the laws of Delaware. Its members are Trireme Energy Holdings, Inc. and James Spencer.

17. Defendant Innogy Renewables US LLC is a limited liability company organized under the laws of Delaware.

18. Defendant Cassadaga Wind LLC is a limited liability company organized under the laws of Delaware.

## JURISDICTION AND VENUE

19. This Court has original jurisdiction over the subject matter of this dispute pursuant to 28 U.S.C. § 1332(a)(1) because this is an action between the citizens of different States, and the amount in controversy exceeds $75,000 exclusive of interest and costs.

20. On information and belief, complete diversity exists between all members of Plaintiffs' LLC and all members of Defendants' LLCs, and no member of Plaintiffs is non-diverse from Defendants' members.

21. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(3), as under the forum selection clause contained in the Merger Agreement, the Southern District of New York has been designated the venue for any and all actions, suits, or other proceedings arising from disputes in connection with the Merger Agreement.

**FACTUAL ALLEGATIONS**

**The Merger Agreement and the Cassadaga Project**

22.     On December 21, 2017, Plaintiffs entered into the Merger Agreement with Innogy for the sale of EverPower's development portfolio of renewable energy projects.  The Merger Agreement was signed by EverPower's President and CEO James Spencer on behalf of Plaintiffs and by Frank Falkenhof and Andrew Young on behalf of Innogy.

23.     Schedule 1.1(f) of the Merger Agreement provided a list of "Company Projects" that were transferred to Innogy.  Among these projects is the Cassadaga Project.  Schedule 1.1(f) identified Cassadaga Wind LLC as the "Project LLC" for the Cassadaga Project.

24.     The Cassadaga Project is a planned 125.5-megawatt wind energy generation project in Chautauqua County, New York, which borders the southeastern shores of Lake Erie.  The project is named after the village of Cassadaga and is located on approximately 40,000 acres in and around the nearby towns of Arkwright, Charlotte, Cherry Creek, and Stockton.  At completion, the Cassadaga Project will include up to 37 wind turbines that will supply power to over 51,000 homes in the Chautauqua County region.

25.     The Merger Agreement transferred ownership of over 30 development projects to Innogy.  The Cassadaga Project, however, is of primary importance.  It is listed first among a defined group of five "Key Projects" in the Merger Agreement.  It is also the first project listed in Annex 1 to the Merger Agreement ("Target Projects, Payment Milestone Amounts, and Expected Installed Capacities").

26.     By the terms of the Merger Agreement, Section 7.6, Innogy undertook certain obligations with respect to timely development of the Cassadaga Project and the other Key Projects.  Section 7.6(a) of the Merger Agreement ("Payment Milestone") states in part:

> (a) From and after Closing Date, Purchaser [Innogy] ***shall use commercially reasonable efforts to cause the Company and the applicable Development Companies to continue to develop the Key Projects*** in accordance with the applicable standards of care set forth on Annex 2. [emphasis added]

27. The Merger Agreement further specifies the "applicable standards of care" that Innogy is required to follow when developing the Cassadaga Project and other Key Projects. Specifically, Annex 2 of the Merger Agreement provides detailed standards for each Key Project, under four separate headings: "Land Rights," "Interconnect," "Permitting and Environmental Studies," and "PPA/Commercial Intake."

28. The applicable standards of care with respect to the Cassadaga Project for "Permitting and Environmental Studies" state that Innogy must do the following: "Continue Article 10 permitting process to definitive decision. Use best efforts to obtain Department of Environmental Conservation documents allowing collection line crossings at Boutwell Hill State Forest." The Article 10 permitting process, as described in further detail below, is the process by which private developers of electricity-generation facilities secure necessary regulatory approvals from New York State.

29. In addition to the requirements of Section 7.6(a) concerning the exercise of commercially reasonable efforts, Section 7.6(b) of the Merger Agreement obligates Innogy to keep James Spencer apprised of the progress of the Key Projects, including the Cassadaga Project:

> (b) Purchaser shall keep the Member Representative informed on a reasonable, periodic basis, but no less frequently than quarterly, regarding the development of each Key Project, by delivering information in the form set forth in <u>Exhibit C</u> to an individual appointed by the Member Representative (the "**Designee**"), who shall initially be James Spencer. From and after the time a Key Project has executed a valid, enforceable interconnection agreement and a valid, enforceable construction agreement, ***Purchaser shall also reasonably cooperate with the Designee to respond to the Designee's reasonable ad-hoc inquiries regarding the development of such Key Project***; provided, however, the designee shall limit such inquiries to a reasonable level, taking into account the stage of development of the applicable Key Project and in any event no more than three inquiries per month. [emphasis added]

30. As set forth in further detail below, Innogy breached both Section 7.6(a) and Section 7.6(b) of the Merger Agreement when it failed to exercise commercially reasonable efforts to develop the Cassadaga Project, and when it failed to reasonably cooperate with James Spencer's reasonable inquiries concerning the status of the Cassadaga Project.

**The Payment Milestones and Payment Milestone Amount**

31. Pursuant to the terms of the Merger Agreement, Innogy agreed to pay Trireme Energy Development, LLC a sum certain for each project once that project reached a specific development stage, referred to in the Merger Agreement as a "Payment Milestone." Accordingly, the amount that Innogy is required to pay Trireme Energy Development, LLC for each project is defined as a "Payment Milestone Amount." The Payment Milestone Amount for the Cassadaga Project is $69,700,000 (subject to adjustment as set forth in the Merger Agreement).

32. The Merger Agreement obligates Innogy to pay Trireme Energy Development, LLC the Payment Milestone Amount for the Cassadaga Project when one of two applicable Payment Milestones occurs. As set forth in the Merger Agreement:

> "**Payment Milestone**" means … with respect to the Cassadaga Project, either (x) prior to October 1, 2019, either (1) the occurrence of the events listed in Section C(1) of Annex 1 or (2) the Cassadaga Project has obtained a valid, enforceable interconnection agreement and construction agreement and a full notice to proceed under such construction contract has been issued for construction of the Cassadaga Project or (y) the Cassadaga Project shall have reached its Commercial Operation Date on or before December 31, 2020.

33. In turn, Annex 1 Section C(1) of the Merger Agreement sets forth the events that needed to occur prior to October 1, 2019 for the Payment Milestone to be reached under condition (x)(1):

> **1.     Payment Milestone for the Cassadaga Project**
>
> The Cassadaga Project shall have achieved its Payment Milestone upon the occurrence of the following:
>     (a)     Issuance of the Article X Certificate by the New York State Board

        on Electric Generation Siting and the Environment (the "Siting Board");
        (b)    Completion by the New York Independent System Operator of 2017 Class Year Facilities Study;
        (c)    Each Cassadaga PPA shall be in full force and effect;
        (d)    Obtaining a valid and enforceable grid connection agreement;
        (e)    All required determinations of No Hazard to Air Navigation from the Federal Aviation Administration; and
        (f)    ***Securing such land rights and Governmental Authorizations as are reasonably required to finance, develop, construct, own, and operate the Cassadaga Project.***    [emphasis added]

34.    In short, the Merger Agreement obligates Innogy to use commercially reasonable efforts to develop the Cassadaga Project as well as other Key Projects, and the Merger Agreement sets forth clear milestones as to when Innogy is obligated to pay Trireme Energy Development, LLC in consideration for its purchase of the Cassadaga Project and other Key Projects.

35.    Simultaneous with the execution of the Merger Agreement, Innogy entered into an agreement with its parent company Innogy SE (the "Parent Company Guarantee") whereby Innogy SE guaranteed Innogy's payment obligations under the Merger Agreement, up to a total "Maximum Amount" of $162,000,000.

36.    Under the terms of the Parent Company Guarantee, Innogy SE "irrevocably and unconditionally guarantee[d] … the payment when due of Purchaser's [*i.e.*, Innogy's] payment obligations arising under the Contract [*i.e.*, the Merger Agreement]."

**Innogy Delays the Cassadaga Project in Order to Avoid the Payment Milestone Amount**

37.    New York oversees and approves the development of major electric generating sites through the New York State Board on Electric Generation Siting and the Environment (the "Siting Board"), a state agency board responsible for ensuring that developers adhere to the process set forth in Article 10 of New York's Public Service Law (the "Article 10 process"). The Article 10 process provides a clear, streamlined procedure for private developers to apply for and receive the permits necessary to initiate and complete development projects.

38. On January 17, 2018, over two and a half years ago, the Siting Board issued a conditional Certificate of Environmental Compatibility and Public Need to Cassadaga Wind LLC, authorizing the construction and operation of the Cassadaga Project (the "Certificate Order").

39. The Certificate Order set forth several conditions requiring the submission of certain compliance filings before construction could begin. For instance, the Certificate Order required the submission of a "Final Health and Safety Plan" for the construction and operation of the Cassadaga Project, a "Final Traffic Control Plan" to minimize disruption to local traffic during construction, and a set of "[m]aps, site plans and profile figures, and construction details" for the Cassadaga Project.

40. The January 17, 2018 Certificate Order also required the submission of two filings in response to Conditions 35 and 36, concerning the potential impact of the Cassadaga Project on any streams and wetlands on the project site and Innogy's plans for mitigating these impacts. Condition 35 required the development and submission of "[f]inal wetland and stream impact drawings, site plans, and construction details" that "incorporate and accurately depict methods for minimization of impacts to each wetland and stream" within the Cassadaga Project Area. Condition 36 required the development and submission of a "final Wetlands Mitigation Plan" in coordination with the New York Department of Environmental Conservation, the New York Department of Public Service, and the Army Corps of Engineers.

41. The Certificate Order setting forth these conditions was issued to Cassadaga Wind LLC on *January 17, 2018*. Yet Innogy did not file its first Wetlands Mitigation Plan with the Siting Board through Cassadaga Wind LLC in response to Condition 36 until *June 21, 2019*, nearly 18 months after the Siting Board first issued its Certificate Order.

42. Innogy's June 21, 2019 compliance filing through Cassadaga Wind LLC was

accompanied by a summary of the filings, titled "Compliance Package Intro Text and Table Final," that briefly discussed the purpose of the filings and provided a chart setting forth Innogy's progress as to each Siting Board condition ("Table 1. Summary of Compliance with Certificate Conditions"). The narrative summary preceding the chart stated in part:

> It should be noted that ***no civil construction work that results in jurisdictional impacts to wetlands or waterbodies will occur prior to receipt of the applicable permits from the US Army Corps of Engineers*** and that all compliance and informational filings relating to wetland and waterbody impacts are satisfied. [emphasis added]

43. The June 21, 2019 compliance filings did not contain a final Wetlands Mitigation Plan, as required by the Siting Board in connection with Condition 36. Instead, it contained a 25-page document titled "Conceptual Compensatory Wetland Mitigation Plan for Cassadaga Wind Project." Innogy knew that this "Conceptual" plan did not meet the Siting Board's requirements. Accordingly, Innogy's "Intro Text and Table" indicated that a final mitigation plan was forthcoming and "will be provided prior to conducting activities that result in regulated impacts to jurisdictional resources."

44. The June 21, 2019 compliance filings also included a one-page placeholder cover sheet stating that Cassadaga Wind LLC's compliance filings in response to Condition No. 35, the "final wetland and stream impact drawings, site plans, and construction details," would be filed "on or before June 28, 2019."

45. Through Cassadaga Wind LLC, Innogy thereafter filed its first "final" wetland and stream impact drawings, site plans, and construction details on ***June 28, 2019***, over 18 months after the Siting Board first issued the ***January 17, 2018*** Certificate Order.

46. Cassadaga Wind LLC's initial compliance filings for Conditions 35 and 36 did not comprise the "final" impact drawings and Wetlands Mitigation Plan that Innogy was required to submit as part of the Article 10 process.

-10-

47.     Yet the permitting portion of the Article 10 process, and in particular the fulfillment of Conditions 35 and 36, did not pose any unique or unreasonable challenges, and Innogy had the reasonable ability to fulfill these conditions far in advance of October 1, 2019 and, in the exercise of commercially reasonable efforts, would have done so.

48.     Indeed, the "Conceptual Compensatory Wetland Mitigation Plan" filed on June 21, 2019 stated that Cassadaga Wind LLC was under "significant time constraints to identify an acceptable mitigation project that will allow the issuance of the USACE Section 404 permit and commencement of project construction."  The Conceptual Mitigation Plan further stated that "[s]ubmittal of the Final Mitigation Plan is scheduled for mid-July 2019, with a 3-week agency review period.  Approval of the Final Mitigation Plan is anticipated in mid-August 2019."

49.     Additionally, Environmental Design & Research ("EDR"), an engineering and environmental services firm that drafted reports on behalf of Innogy and Cassadaga Wind LLC relating to the Cassadaga Project, sent a letter dated August 30, 2019 to the U.S. Army Corps of Engineers enclosing an "Addendum to Preliminary Jurisdictional Determination" referring to "additional delineations *conducted in fall of 2018 and in 2019* outside of the 2017 PJD corridor." [emphasis added]

50.     The August 30, 2019 EDR letter also stated: "*In the fall of 2018, and spring/summer of 2019*, EDR biologists visited the Facility Site to determine if any wetlands or streams occur in areas that could be affected by the revised Facility layout and public road improvements and were not evaluated in the previous delineations."

51.     EDR's August 30, 2019 letter indicates that it had completed necessary work in connection with the wetlands mitigation plan that should have left Innogy and Cassadaga Wind LLC with ample time to submit the Final Wetlands Mitigation Plan by mid-July 2019, as promised

in the Conceptual Mitigation Plan, had Innogy exercised commercially reasonable efforts.

52. Instead, Innogy delayed in filing the final wetland and stream impact drawings through Cassadaga Wind LLC until *September 13, 2019*, less than three weeks before the Cassadaga Project Payment Milestone date of October 1, 2019.

53. Likewise, Innogy delayed in filing the Final Wetlands Mitigation Plan through Cassadaga Wind LLC until *September 20, 2019*, over two months after the "mid-July 2019" date stated in the Conceptual Mitigation Plan and a mere 11 days prior to October 1, 2019.

54. On information and belief, Innogy knew that these late filings triggered a twenty-one day notice and comment period under the Article 10 process.

55. On information and belief, Innogy also knew that by delaying the completion of Cassadaga Wind LLC's compliance filings for Condition 35 and Condition 36 until less than twenty-one days prior to October 1, 2019, it ensured that the Siting Board would not be able to approve the compliance filings prior to October 1, 2019, and that it would thereby be able to represent that it had not yet secured the approvals "reasonably required to finance, develop, construct, own, and operate the Cassadaga Project."

56. On information and belief, Innogy had completed and was in a position to submit Cassadaga Wind LLC's final compliance filings for Conditions 35 and 36 sufficiently in advance of September 13 and September 20, 2019 to achieve the Payment Milestone.

57. On information and belief, Innogy intentionally withheld Cassadaga Wind LLC's final compliance filings for Conditions 35 and 36 in order to delay completion of the 21-day notice and comment period, and thereby in turn to delay the Siting Board's final approval of these compliance filings, until after October 1, 2019 had passed.

58. Less than one week after the October 1, 2019 Payment Milestone date, Innogy filed

-12-

Cassadaga Wind LLC's Pre-Construction Notice with the Siting Board, announcing its intention to begin construction on the Cassadaga Project by October 21, 2019.  On October 22, 2019, the Siting Board approved Cassadaga Wind LLC's final compliance filings for Conditions 35 and 36.

59. On information and belief, Innogy intentionally delayed pursuing the wetlands permitting process in order to ensure that it would not meet all of the conditions for the Cassadaga Project's Payment Milestone by October 1, 2019, and thereby to avoid its contractual obligation to pay Trireme Energy Development, LLC the Payment Milestone Amount for the Cassadaga Project.

60. On information and belief, Innogy could have achieved the October 1, 2019 Payment Milestone had it exercised commercially reasonable efforts in developing the Cassadaga Project.

61. On information and belief, Innogy also failed to exercise commercially reasonable efforts to develop the Cassadaga Project, and intentionally delayed the completion of the Cassadaga Project, by removing the Cassadaga Project's original development team from key leadership positions shortly after the transaction contemplated by the Merger Agreement was completed, and by replacing these experienced team members with less experienced individuals who had no historical knowledge of the Cassadaga Project or the efforts made by Plaintiffs and James Spencer to develop the Cassadaga Project up to that point.

62. On information and belief, by removing the Cassadaga Project's original development team, Innogy unreasonably negated years of goodwill and relationship-building by Plaintiffs and James Spencer with New York state regulatory and permitting officials, as well as federal regulatory and permitting officials.  By doing so, Innogy all but guaranteed that the Cassadaga Project would face unnecessary and avoidable delays.

63. By intentionally delaying development of the Cassadaga Project, Innogy is in breach of Section 7.6(a) of the Merger Agreement, which requires Innogy to use "commercially reasonable efforts" to develop the Cassadaga Project and other Key Projects.

64. In connection with Innogy's and its own intentional delay, Cassadaga Wind LLC has tortiously interfered with the Merger Agreement to deprive Plaintiffs of the Payment Milestone Amount.

**Innogy Denies That the Payment Milestone Amount is Due**

65. On August 13, 2019, after Innogy had caused Cassadaga Wind LLC to file an initial Pre-Construction Notice for the Cassadaga Project relating to tree-clearing, James Spencer gave written notice to Innogy that he believed the Payment Milestone had occurred.

66. On August 15, 2019, Innogy replied in a letter that it disagreed with Mr. Spencer's position, and stated its own belief that the Payment Milestone had not occurred. In this letter, Innogy stated that two of the conditions set forth in Annex 1, Section C(1) of the Merger Agreement had not been met, because Innogy and Cassadaga Wind LLC had not yet "[o]btain[ed] a valid and enforceable grid connection agreement" and because Innogy and Cassadaga Wind LLC had not yet "[s]ecur[ed] such land rights and Governmental Authorizations as are reasonably required to finance, develop, construct, own, and operate the Cassadaga Project."

67. In support of its position that the Payment Milestone had not occurred, Innogy's August 15, 2019 letter attached and referred to its quarterly Development Update report for the second quarter of 2019. Under the heading "Interconnect," the Development Update stated in part, "LGIA under negotiation. Earliest expected signature date end July." Under the heading "Permitting and Environmental Studies," the Development Update also stated in part, "USACE permit review underway *and expected late Q3-2019* as dependent on DEC Wetland mitigation

site."

68. Through Cassadaga Wind LLC, Innogy obtained a valid and enforceable grid connection agreement, in satisfaction of Annex 1, Section C(1)(d) of the Merger Agreement, by mid-September 2019. But Innogy failed to obtain the required permit from the U.S. Army Corps of Engineers prior to October 1, 2019.

69. On information and belief, Innogy would have achieved the October 1, 2019 Payment Milestone had it exercised commercially reasonable efforts in developing the Cassadaga Project.

**Innogy Ignores James Spencer's Requests for Information**

70. As set forth in the Merger Agreement, Innogy is obligated to "reasonably cooperate with the Designee," defined in the Merger Agreement as James Spencer, "to respond to the Designee's reasonable ad-hoc inquiries regarding the development" of the Key Projects, including the Cassadaga Project.

71. On April 1, 2020, in an email addressed to Innogy representative Chip Readling, James Spencer requested a construction update on the Cassadaga Project, stating, "[i]t would be helpful to understand the status of construction at the site." Mr. Spencer also requested that Innogy "please update the Interconnection section" of its quarterly update for the first quarter of 2020, as "[o]ur information is not consistent with your description of several issues."

72. Later than day, Mr. Readling replied in part in an email, "Hi Jim, I'll get a construction update and provide some information."

73. To date, Mr. Spencer has not received the construction update promised in Mr. Readling's email of April 1, 2020.

74. On May 19, 2020, James Spencer submitted to Innogy a formal written request for

information, addressed to Innogy executives Frank Falkenhof, Gunnar Helberg, and Richard Casey. In this letter, Mr. Spencer reiterated his request for an update on "the status of determination of the final interconnection costs for the Cassadaga Project." Mr. Spencer also asked that Innogy provide its "current expectation for the Commercial Operation Date for the Cassadaga Project," with a copy of the current construction schedule or timeline, as well as information concerning the Cassadaga Project's Power Purchase Agreements.

75. To date, Mr. Spencer has received none of the information he requested from Innogy on May 19.

76. By ignoring, neglecting, and otherwise failing to reasonably cooperate with Mr. Spencer's reasonable inquiries concerning the development of the Cassadaga Project, Innogy is in breach of Section 7.6(b) of the Merger Agreement.

## COUNT I (as against Innogy)
## (BREACH OF CONTRACT)

77. Plaintiffs incorporate, restate, and re-allege the preceding paragraphs as if fully set forth herein.

78. The Merger Agreement constitutes a valid and binding contract between Plaintiffs and Innogy.

79. Innogy has breached the Merger Agreement through its conduct described above, including its failure to exercise commercially reasonable efforts to develop the Cassadaga Project, its failure to pay Trireme Energy Development, LLC the Payment Milestone Amount, and its failure to reasonably cooperate with James Spencer concerning the development of the Cassadaga Project.

80. As a direct and proximate cause of these breaches, Plaintiffs have been damaged in excess of $75,000.

-16-

## COUNT II (as against Cassadaga Wind LLC)
## (TORTIOUS INTERFERENCE WITH CONTRACT)

81. Plaintiffs incorporate, restate, and re-allege the preceding paragraphs as if fully set forth herein.

82. The Merger Agreement constitutes a valid and binding contract between Plaintiffs and Innogy.

83. Cassadaga Wind LLC at all relevant times has had knowledge of the Merger Agreement and its terms, including as to the Payment Milestone Amount and Innogy's obligation to exercise commercially reasonable efforts to develop the Cassadaga Project.

84. As the designated "Project LLC" for the Cassadaga Project, Cassadaga Wind LLC has intentionally and improperly prevented achievement of the Payment Milestones by October 1, 2019 in order to deny Trireme Energy Development, LLC the Payment Milestone Amount under the Merger Agreement, and in doing so has tortiously interfered with the Merger Agreement.

85. Cassadaga Wind LLC procured Innogy's breaches of the Merger Agreement, and in doing so has tortiously interfered with the Merger Agreement.

86. Cassadaga Wind LLC's interferences were without justification or excuse.

87. On information and belief, Cassadaga Wind LLC benefitted from its tortious interference with the Merger Agreement.

88. As a direct and proximate cause of this tortious interference with the Merger Agreement, Plaintiffs have been damaged in excess of $75,000.

## COUNT III (as against Cassadaga Wind LLC)
## (UNJUST ENRICHMENT)

89. Plaintiffs incorporate, restate, and re-allege the preceding paragraphs as if fully

set forth herein.

90. As the designated "Project LLC" for the Cassadaga Project, Cassadaga Wind LLC has intentionally and improperly prevented achievement of the Payment Milestones by October 1, 2019 in order to deny Trireme Energy Development, LLC the Payment Milestone Amount under the Merger Agreement.

91. As a result of Cassadaga Wind LLC's intentional and improper delay, Cassadaga Wind LLC improperly retained the Payment Milestone Amount of $69,700,000 for the Cassadaga Project that was and is properly due to Trireme Energy Development, LLC under the terms of the Merger Agreement.

92. In so doing, Cassadaga Wind LLC has enriched itself at Plaintiffs' expense.

93. It is against equity and good conscience to permit Cassadaga Wind LLC to retain the Payment Milestone Amount for the Cassadaga Project, which will enable Cassadaga Wind LLC to further enrich itself at Plaintiffs' expense.

**COUNT IV (as against Innogy SE)**
**(DECLARATORY JUDGMENT)**

94. Plaintiffs incorporate, restate, and re-allege the preceding paragraphs as if fully set forth herein.

95. The Parent Company Guarantee constitutes a valid and binding contract between Innogy and its parent company Innogy SE.

96. A justiciable controversy exists between Plaintiffs and Innogy SE because, pursuant to the terms of the Parent Company Guarantee, Innogy SE is liable for the payment obligations of Innogy under the Merger Agreement, including the payment of the Payment Milestone Amount for the Cassadaga Project.

97. Plaintiffs seek a declaratory judgment that Innogy SE is liable to Plaintiffs for

payment of the $69,700,000 Payment Milestone Amount in connection with the Cassadaga Project.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs respectfully request that the Court enter judgment against Innogy and Cassadaga Wind LLC as follows:

A. Specific Performance requiring Innogy to pay to Trireme Energy Development, LLC the Payment Milestone Amount of $69,700,000 in connection with the Cassadaga Project;

B. Awarding Plaintiffs actual and compensatory monetary damages in an amount in excess of $75,000, plus prejudgment interest;

C. Declaratory relief against Innogy SE that it is liable for the Payment Milestone Amount.

D. For any other relief as this Court deems just and proper.

Dated: June 30, 2020　　　　　　　　　　　　MORGAN, LEWIS & BOCKIUS LLP

By: _____
Matthew R. Ladd
101 Park Ave., Floor 45
New York, NY 10178-0060
+1.212.309.6141
+1.212.309.6001
matthew.ladd@morganlewis.com

John K. Gisleson*
One Oxford Center, Floor 32
Pittsburgh, PA 15219-6401
+1.412.560.7435
+1.412.560.7001
john.gisleson@morganlewis.com
*Pro hac vice admission pending

*Attorneys for Plaintiffs Trireme Energy Holdings, Inc. and Trireme Energy Development, LLC*