```
┌─────────────────────────────────────┐
│ USDC SDNY                            │
│ DOCUMENT                             │
│ ELECTRONICALLY FILED                 │
│ DOC #:_____               │
│ DATE FILED: 8/17/2021                │
└─────────────────────────────────────┘
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------X

TRIREME ENERGY HOLDINGS, INC.; and            :
TRIREME ENERGY DEVELOPMENT, LLC,              :
                                              :
                              Plaintiffs,     :
                                              :                    20-CV-5015 (VEC)
              -against-                       :
                                              :                    OPINION AND ORDER
                                              :
INNOGY RENEWABLES US LLC;                      :
CASSADAGA WIND LLC; and INNOGY SE,            :
                                              :
                              Defendants.     :
------------------------------------------------------------X

VALERIE CAPRONI, United States District Judge:

       This case involves claims brought by Plaintiffs Trireme Energy Holdings, Inc. and

Trireme Energy Development, LLC (collectively "Trireme) against Defendants Innogy

Renewables US LLC ("Innogy"), Cassadaga Wind LLC, and Innogy SE related to Defendants'

purported failure to develop and operationalize a wind farm that they acquired from Plaintiffs.

Plaintiffs assert claims for breach of contract, breach of the implied covenant of good faith and

fair dealing, unjust enrichment, reformation, and tortious interference.

       The COVID-19 pandemic has wreaked havoc on the world over the past 18-plus months

and has precipitated countless lawsuits to date, with more certain to follow.  As originally pled,

this case, although filed in its throes, was entirely unrelated to the COVID pandemic, and

Plaintiffs' claims involved only Defendants' conduct from 2019 and earlier, which allegedly

breached the terms of the parties' merger agreement.  In January 2021, however, Plaintiffs, on

consent, filed a Second Amended Complaint ("SAC"), pursuant to which the COVID pandemic

now plays a starring role in the dispute among the parties.  *See generally* SAC, Dkt. 43.  In

Plaintiffs' view, in addition to breaching the contract in 2019, Defendants have since callously

1

and in bad faith taken advantage of certain alterations to government and regulatory policies caused by the COVID pandemic to deprive Plaintiffs of the benefits of the parties' contract.

Defendants have moved pursuant to Federal Rule of Civil Procedure 12(b)(6) to dismiss Plaintiffs' claims for breach of the implied covenant of good faith and fair dealing, unjust enrichment, and reformation, all of which are allegedly predicated on Defendants' alleged bad faith conduct since the Internal Revenue Service ("IRS") changed certain guidance in response to the pandemic.  *See* Notice of Mot., Dkt. 44.  Defendants have also moved to dismiss Plaintiffs' claim for tortious interference.  *Id.*  For the following reasons, Defendants' motion to dismiss is GRANTED in part and DENIED in part.

## BACKGROUND[1]

In December 2017, Trireme, then the owner and operator of multiple large-scale wind farms, entered into a merger agreement (the "Merger Agreement") with Innogy, a renewable energy company, pursuant to which Innogy acquired Plaintiffs' portfolio of renewable energy projects that were in development.  *See* SAC ¶¶ 29–30, 34–35.  Among the projects under development was the Cassadaga Project, a wind energy generation project in upstate New York. *Id.* ¶¶ 31, 38.  Trireme operated each of its projects through a different special-purpose entity; the Cassadaga Project was developed through a special-purpose entity known as Cassadaga Wind, LLC.  *Id.* ¶ 31.

Under the Merger Agreement, Innogy agreed to pay Plaintiffs $50 million upfront, plus an additional payment (the "Payment Milestone Amount") if at least one contractually-defined milestone (the "Payment Milestones") was met.  *Id.* ¶¶ 36–37.  The Merger Agreement

---

[1]    On a motion to dismiss, the Court must accept all factual allegations in the complaint as true and draw all reasonable inferences in the light most favorable to the plaintiff.  *See Gibbons v. Malone*, 703 F.3d 595, 599 (2d Cir. 2013).

established the following Payment Milestones for the Cassadaga Project:  If (1) by October 1,

2019, Innogy had, *inter alia*, received all permits and approvals necessary for completion of the

project ("October Milestone"), *or* (2) by December 31, 2020, the Cassadaga Project had achieved

commercial operation ("December Milestone"), Innogy would make an additional payment of

$69.7 million to Plaintiffs.  *See id.* ¶¶ 37–41, 53; Merger Agreement, Annex 1 § C.1, Dkt. 54-1.

The Merger Agreement further provided:

> From and after Closing Date, [Innogy] shall use commercially reasonable
> efforts . . . to continue to develop the Key Projects[2] in accordance with the
> applicable standards of care set forth on Annex 2.  Subject to the preceding
> sentence, the details and manner of such development efforts and the
> schedule therefor shall be within the sole discretion of [Innogy].  In the
> event [Innogy] determines to cease development of and abandon any such
> Key Project prior to October 1, 2019, [Innogy] shall so inform the Member
> Representative, including the reason therefor, and thereafter [Innogy] shall
> have no further obligation with respect to development of any such Key
> Project.

Merger Agreement §7.6(a); *see also* SAC ¶ 42.  The Merger Agreement also required Innogy to

"reasonably cooperate" with a representative of Trireme, initially its President James Spencer, to

respond to Trireme's "reasonable ad-hoc inquiries into the development of" the Cassadaga

Project.  Merger Agreement §7.6(b).

    Shortly after the parties executed the Merger Agreement, Innogy removed the Cassadaga

Project's original development team from key leadership positions and replaced them with less

experienced individuals, purportedly delaying the project's development.  SAC ¶¶ 97–98.

Thereafter, through Cassadaga Wind LLC, Innogy submitted incomplete compliance filings to

the New York State Board on Electric Generation Siting and the Environment (the "Siting

Board") nearly 18 months after it had received authorization from the Siting Board to build and

operate the Cassadaga Project.  *See id.* ¶¶ 72–77, 79–82, 87–89, 91–94.  According to Plaintiffs,

---

[2]     The Merger Agreement defines the Cassadaga Project as a Key Project.  *See* Merger Agreement § 1.1.

Innogy was capable of operating on a more expedited schedule and knowingly delayed certain work and filings to avoid having to pay the Payment Milestone Amount pursuant to the October Milestone.  *Id.* ¶¶ 83, 90–93, 95–98.

Ultimately, the Siting Board did not approve the final compliance filings for the Cassadaga Project until after the October Milestone had passed.  *Id.* ¶ 94.  Subsequently, in April and May 2020, Trireme's President made informal and formal requests for information from Innogy, which went unanswered until mid-September 2020.  *See id.* ¶¶ 106–114.  Plaintiffs allege that Innogy breached the Merger Agreement by "fail[ing] to exercise commercially reasonable efforts to develop the Cassadaga Project, . . . fail[ing] to pay Trireme Energy Development, LLC the Payment Milestone Amount, and . . . fail[ing] to reasonably cooperate with James Spencer concerning the development of the Cassadaga Project."  *Id.* ¶ 156.

The parties structured the Merger Agreement based on then-existing IRS guidance and regulations.  *See id.* ¶¶ 50–55, 60.  The IRS provides tax credits (Production Tax Credits or "PTCs") for electricity produced from certain renewable resources, with the amount of PTCs available to each energy facility determined based on the calendar year in which construction of the facility began.  *Id.* ¶ 45.  To obtain the credits, the IRS requires that continuous efforts be undertaken to build and develop each facility (the "Continuity Requirement") but provides a safe harbor to allow projects a reasonable time to be placed into service.  *See id.* ¶¶ 45–47.  Generally, placing a facility into service no more than four calendar years after construction commences satisfies the Continuity Requirement.  *Id.* ¶ 47.  Under then-operative IRS guidance, because the Cassadaga Project began construction in 2016, the project would generate "significant" PTCs, potentially totaling $120 million or more, only if the project achieved commercial operation on or before December 31, 2020; the project would generate no PTCs if it

achieved commercial operation on January 1, 2021, or later. *Id.* ¶¶ 9–10, 47, 62.  According to

Plaintiffs, a project's ability to satisfy IRS safe harbor requirements is frequently central to its

ability to attract investments, and the structure of the Merger Agreement operated to align the

interests of the parties — Trireme would receive the Payment Milestone Amount and Innogy

would receive the tax credits, but only if the Cassadaga Project achieved commercial operation

no later than December 31, 2020.  *See id.* ¶¶ 48–49, 55–57, 60.

In May 2020, in response to the COVID pandemic, the IRS revised its relevant guidance,

extending by one year the safe harbor for facilities that began construction in 2016. *Id.* ¶ 61.

Under the new regulatory regime, the Cassadaga Project could satisfy the safe harbor and

generate PTCs if it achieved commercial operation no later than December 31, *2021*.  *Id.*  The

change in the IRS' position, then, resulted in the parties' interests no longer being aligned. *Id.* ¶¶

16, 63.  Under the new guidance, if the Cassadaga Project reached commercial operation after

December 31, 2020, having missed both the October Milestone and the December Milestone,

Innogy could obtain the PTCs without paying Trireme the Payment Milestone Amount.  *Id.*

Ultimately, the Cassadaga Project did not achieve commercial operation by December

31, 2020, *id.* ¶ 68, and on January 13, 2021, Plaintiffs, pursuant to a joint stipulation, filed the

SAC, alleging that Innogy, in bad faith, delayed commercial operation until after the December

Milestone to ensure that it would not have to pay Plaintiffs the $69.7 million Payment Milestone

Amount, *id.* ¶¶ 17, 125.

## DISCUSSION

### I.      **Legal Standard on a Motion to Dismiss**

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient

factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft*

*v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "[A] complaint does not need to contain detailed or elaborate factual allegations, but only allegations sufficient to raise an entitlement to relief above the speculative level."  *Keiler v. Harlequin Enters. Ltd.*, 751 F.3d 64, 70 (2d Cir. 2014) (citation omitted).  Nevertheless, "[a] pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'"  *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555).

On a motion to dismiss, the Court may consider "any written instrument attached to [the complaint] as an exhibit or any statements or documents incorporated in it by reference," as well as materials "integral to plaintiffs' claims."  *Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 47 (2d Cir. 1991).  When considering a Rule 12(b)(6) motion to dismiss, the Court accepts all factual allegations in the complaint as true and draws all reasonable inferences in the light most favorable to the plaintiff.  *See Gibbons v. Malone*, 703 F.3d 595, 599 (2d Cir. 2013).  The Court, however, is not required "to accept as true a legal conclusion couched as a factual allegation."  *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 556).

## II.  Defendants' Motion to Dismiss Plaintiffs' Claim for Breach of the Covenant of Good Faith and Fair Dealing Is Denied

Defendants advance two independent arguments in support of their motion to dismiss Plaintiffs' claim for breach of the implied covenant of good faith and fair dealing: (1) Plaintiffs' claim must be dismissed because it is duplicative of their separate breach of contract claim; and (2) the Court cannot enforce an implied covenant of good faith and fair dealing in this case because such a covenant would be inconsistent with the express terms of the Merger Agreement.  *See* Defs. Mem. at 6–10, Dkt. 45.  Although distinct, Defendants' arguments implicate similar issues, requiring analysis of Plaintiffs' claims for breach of contract and breach of the implied covenant, the factual allegations underpinning each, and the terms of the Merger Agreement.

6

As pled, Plaintiffs' breach of contract claim alleges that Innogy breached section 7.6(a) of the Merger Agreement by failing to exercise commercially reasonable efforts to develop the Cassadaga Project.  *See* SAC ¶¶ 99, 153–157.  According to Plaintiffs, their breach of contract claim is predicated exclusively on Innogy's intentional delay in developing the Cassadaga Project to ensure that Innogy would be unable to meet the development benchmarks underlying the October Milestone — a milestone that it could have achieved had it exercised commercially reasonable efforts.  *See* SAC ¶¶ 96, 99; Pls. Opp. at 11–12, Dkt. 53.[3]  In contrast, as pled, Plaintiffs' claim for breach of the implied covenant of good faith and fair dealing alleges that Innogy acted in bad faith to obtain a "windfall" by delaying commercial operation of the Cassadaga Project until after December 31, 2020, despite Innogy's clear ability to have achieved commercial operation by that date.  *See* SAC ¶¶ 125–126.

Because Plaintiffs' claims for breach of contract and breach of the implied covenant involve distinct factual allegations, and because the commercially reasonable efforts clause and the implied covenant entail distinct standards such that the factual allegations underpinning Plaintiffs' claim for breach of the implied covenant could potentially constitute a breach of the implied covenant but not the commercially reasonable efforts clause, Defendants' motion to dismiss Plaintiffs' claim for breach of the implied covenant is denied.

### A.  Applicable Law

Under New York law, although an implied covenant of good faith and fair dealing is implicit in every contract, *Spinelli v. Nat'l Football League*, 903 F.3d 185, 205 (2d Cir. 2018), a

---

[3]    Plaintiffs also allege that Defendants breached section 7.6(b) of the Merger Agreement by "ignoring, neglecting, and otherwise failing to reasonably cooperate with Mr. Spencer's reasonable inquiries concerning the development of the Cassadaga Project."  SAC ¶ 115.  Plaintiffs do not include in their complaint a specific count for breach of contract concerning this alleged breach, and their sole breach of contract claim is explicitly framed as related to "Commercially Reasonable Efforts."  *Id.* at 29.  In any event, these distinct allegations — and perhaps distinct claim — are not at issue on this motion because Defendants have not moved to dismiss any breach of contract claim asserted by Plaintiffs.

claim for breach of the implied covenant must be dismissed as duplicative when a breach of contract claim is pled on the same facts, *see Harris v. Provident Life & Accident Ins. Co.*, 310 F.3d 73, 80–81 (2d Cir. 2002), or when the conduct at issue "is also the predicate for breach of the underlying contract," *Cary Oil Co. v. MG Refin. & Mktg., Inc.*, 90 F. Supp. 2d 401, 419 (S.D.N.Y. 2000).  *See also Transcience Corp. v. Big Time Toys, LLC*, 50 F. Supp. 3d 441, 451-52 (S.D.N.Y. 2014) ("New York law does not recognize a separate cause of action for breach of the implied covenant of good faith and fair dealing when a breach of contract claim, based on the same facts, is also pleaded.").  Similarly, if a breach of contract claim is broader than a claim for breach of the implied covenant, *i.e.*, "the factual allegations in [the] contract claim encompass and include the factual allegations in [the] breach of [the] implied covenant claim," the implied covenant claim must be dismissed as redundant.  *Deutsche Bank Sec., Inc. v. Rhodes*, 578 F. Supp. 2d 652, 664 (S.D.N.Y. 2008).  Moreover, a plaintiff may not circumvent the bar on duplicative claims by bifurcating its allegations into separate claims for breach of contract and breach of the implied covenant when the breach of contract claim could have encompassed the allegations pled in the breach of the implied covenant claim.  *See ARI & Co. v. Regent Int'l Corp.*, 273 F. Supp. 2d 518, 523 (S.D.N.Y. 2003).

When there is a bona fide dispute over whether a contract covers the contested issue, however, a plaintiff may assert claims for both breach of contract and breach of the implied covenant.  *See Fantozzi v. Axsys Techs., Inc.*, No. 07-CV-2667, 2008 WL 4866054, at *7 (S.D.N.Y. Nov. 6, 2008).  Thus, "[a] claim for breach of the covenant of good faith and fair dealing 'may be brought, if at all, only where one party's conduct, though not breaching the terms of the contract in a technical sense, nonetheless deprived the other party of the benefit of

its bargain.'"  *CSI Inv. Partners II, L.P. v. Cendant Corp.*, 507 F. Supp. 2d 384, 425 (S.D.N.Y. 2007) (quoting *Sauer v. Xerox Corp.*, 95 F. Supp. 2d 125, 132 (W.D.N.Y. 2000)).

One factor courts consider in assessing whether claims are duplicative is the relatedness of the damages sought in each claim.  *See ARI*, 273 F. Supp. 2d at 523 ("Under New York law, claims for breach of the implied covenant of good faith which seek to recover damages that are intrinsically tied to the damages allegedly resulting from the breach of contract must be dismissed as redundant.").  If the two claims involve different underlying factual allegations, however, a plaintiff may pursue both claims even if the damages are identical or "intrinsically tied" together, with the issue of "double recovery" to be addressed at a later stage of the case. *See, e.g.*, *Sobel v. Major Energy Servs., LLC*, No. 19-CV-8290, 2020 WL 5362357, at *8–9 (S.D.N.Y. Sept 8, 2020); *Stop & Shop Supermarket Co. v. Goldsmith*, No. 10-CV-3052, 2013 WL 3179501, at *8–9 (S.D.N.Y. June 24, 2013).

Additionally, a court may not imply a covenant inconsistent with terms expressly set forth in an agreement; in other words, where an express covenant exists, a court may not find an implied covenant on the same subject.  *See Hartford Fire Ins. Co. v. Federated Dep't Stores, Inc.*, 723 F. Supp. 976, 991 (S.D.N.Y. 1989); *Murphy v. Am. Home Prods. Corp.*, 58 N.Y.2d 293, 304 (1983) ("No obligation can be implied, however, which would be inconsistent with other terms of the contractual relationship.").  Moreover, a party may not rely on the implied covenant of good faith and fair dealing to avoid the express terms of the contract.  *Times Mirror Mags., Inc. v. Field & Stream Licenses Co.*, 294 F.3d 383, 394–95 (2d Cir. 2002).  "[T]he implied covenant will only aid and further the explicit terms of the agreement and will never impose an obligation which would be inconsistent with the other terms of the contractual

relationship." *Metro. Life Ins. Co. v. RJR Nabisco, Inc.*, 716 F. Supp. 1504, 1517 (S.D.N.Y. 1989) (cleaned up).

### B.  Plaintiffs' Claim Is Not Duplicative of Their Breach of Contract Claim

At this stage, the Court cannot conclude that Plaintiffs' claims are duplicative because, as pled, they rely on distinct conduct that invokes two distinct legal standards.  In other words, because Defendants' conduct — as alleged — in connection with the December Milestone is different from Defendants' conduct supporting Plaintiffs' claim for breach of contract, and because it is plausible that Defendant's purported decision to delay commercial operation until after December 31, 2020, may not "breach[] the terms of the contract in a technical sense" by violating the commercially reasonable efforts clause but may nonetheless "deprive[] the other party of the benefit of its bargain" as an act of bad faith, Plaintiffs may continue to pursue both their claim for breach of contract and their claim for breach of the implied covenant.  *CSI Inv. Partners II*, 507 F. Supp. 2d at 425 (cleaned up).

At first glance, the language Plaintiffs use to plead their breach of contract claim is broadly worded and without limitation to a specific time period or conduct.  *See* SAC ¶¶ 153–157.  Looking to the totality of the SAC, however, and accepting Plaintiffs' construal of their claim, *see Yoder v. Orthomolecular Nutrition Inst., Inc.*, 751 F.2d 555, 562 (2d Cir. 1985) ("It is elementary that, on a motion to dismiss, a complaint must be read as a whole, drawing all inferences favorable to the pleader."), Plaintiffs' breach of contract claim is based on Innogy's failure to develop the Cassadaga Project in the period leading up to and immediately preceding the October Milestone.  To support their breach of contract claim, Plaintiffs point to, *inter alia*,

Innogy's delayed compliance filings and replacement of the project's original development team as failures to exercise commercially reasonable efforts to reach the October Milestone.[4]

By contrast, the language used to plead Plaintiffs' implied covenant claim is specific to Defendants' alleged conduct in connection with the December Milestone. *See* SAC ¶¶ 119–129. Plaintiffs' breach of the implied covenant claim is predicated entirely on Innogy's bad faith decision not to achieve commercial operation of the Cassadaga Project by December 31, 2020. Although Plaintiffs allege that Innogy had the "ability to achieve commercial operation" before the December 31, 2020 deadline, *e.g., id.* ¶ 125, Plaintiffs have not alleged that Innogy's failure to do so was on account of its failure to exercise commercially reasonable efforts, as required under the Merger Agreement. Instead, Plaintiffs characterize this conduct strictly as a product of Innogy's bad faith.

Furthermore, although both claims seek identical damages — the $69.7 million Payment Milestone Amount, *see* SAC ¶¶ 129, 157 — that is not sufficient to render the claims duplicative. Here, the Merger Agreement contains two distinct triggers, satisfaction of either of which entitled Plaintiffs to the Payment Milestone Award. *See* Merger Agreement § 1.1. Although upon the satisfaction of either of these triggers, Plaintiffs would be entitled to the same payout of $69.7 million, that does not mean that Defendants' conduct to prevent the occurrence of each event is necessarily factually identical or even interrelated in any way. Instead, as is the case

---

[4]    *See, e.g.*, SAC ¶ 20 ("In 2019, Innogy missed an earlier deadline . . . that would have triggered the $69.7 million payment at that time. In doing so, Innogy either abused its discretion or failed to use commercially reasonable efforts . . . to complete the project."); *id.* ¶ 83 ("Innogy had the reasonable ability to fulfill these conditions [concerning development of the Cassadaga Project] far in advance of October 1, 2019, and, in the exercise of commercially reasonable efforts, would have done so."); *id.* ¶ 87 ("Innogy . . . [should have had] ample time to submit [a particular compliance filing] by mid-July 2019 . . . had Innogy exercised commercially reasonable efforts."); *id.* ¶ 96 ("Innogy could have achieved the October 1, 2019 Payment Milestone had it exercised commercially reasonable efforts."); *id.* ¶ 97 ("Innogy also failed to exercise commercially reasonable efforts to develop the Cassadaga Project . . . by removing the Cassadaga Project's original development team from key leadership positions . . . ."); *id.* ¶ 99 ("By intentionally delaying development of the Cassadaga Project, Innogy is in breach of [the commercially reasonable efforts clause] of the Merger Agreement . . . .").

here, the factual circumstances giving rise to Plaintiffs' claims do not overlap at all, despite the

fact that Plaintiffs are allegedly entitled to (at least) $69.7 million under each claim.

Accordingly, because different factual allegations underpin each of Plaintiffs' claims, the overlap

in damages sought does not render Plaintiffs' claims duplicative.  *See Sobel*, 2020 WL 5362357,

at *8.

Accepting Plaintiffs' construction, then, their claims rest on different factual predicates.

Plaintiffs' breach of contract claim arises out of Innogy's failure to meet the October Milestone,

while its breach of the implied covenant claim arises out of Innogy's bad faith decision not to

operationalize the Cassadaga Project before December 31, 2020.  Pls. Opp. at 11–12.

Notwithstanding the above, if facts that constitute a breach of the implied covenant claim

could have been alleged within Plaintiffs' breach of contract claim, a separate cause of action for

breach of the implied covenant cannot stand.  *See ARI*, 273 F. Supp. 2d at 523 ("That [plaintiff]

chose not to include the allegations that comprised its [breach of the implied covenant] claim

within the contents of the . . . breach of contract claim[] 'does not mean that those acts support a

separate claim for breach of an implied covenant of good faith.'" (quoting *Alter v. Bogoricin*,

No. 97-CV-662, 1997 WL 691332, at *8 (S.D.N.Y. Nov. 6, 1997))); *see also CSI Inv. Partners*,

507 F. Supp. 2d at 425.  Defendants argue that (1) Plaintiffs' breach of the implied covenant

claim "is essentially encompassed by the allegation[s] in the breach of contract claim," and, to

the extent it is not, it could have been; and (2) Plaintiffs engaged in an overly cute attempt to

create separate claims out of whole cloth.  Defs. Mem. at 8 (quoting *Underdog Trucking, LLC v.

Verizon Servs. Corp.*, No. 09-CV-8918, 2010 WL 2900048, at *6 (S.D.N.Y. July 20, 2010).

There are undoubtedly similarities between the conduct underlying Plaintiffs' claims,

which would seemingly support the position that, if Innogy's alleged conduct in connection with

the October Milestone supports a claim for breach of the commercially reasonable efforts clause, then so too does Innogy's conduct in connection with the December Milestone. For instance, in connection with the breach of contract claim, Plaintiffs allege that Innogy delayed submitting necessary filings and instead chose to make those submissions at a time at which it would be impossible to meet the October Milestone. *See* Pls. Opp. at 7. In a similar vein, in connection with their implied covenant claim, Plaintiffs allege that Innogy intentionally delayed commercial operation of the Cassadaga Project to avoid triggering the Payment Milestone Award. *See* SAC ¶ 124 ("Innogy exercised its discretion as to the schedule for developing the Cassadaga Project arbitrarily and in bad faith by choosing to achieve commercial operation of the project *after* December 31, 2020 (notwithstanding Innogy's ability to achieve commercial operation of the project by that date) . . . .").

Despite the apparent similarities in these allegations, Plaintiffs allege that Innogy's "intentionally delaying development of the Cassadaga Project" constitutes breach of the commercially reasonable efforts clause as to the October Milestone, *see id.* ¶ 99, whereas Innogy's decision to delay commercial operation of the Cassadaga Project constitutes only a breach of the implied covenant of good faith and fair dealing, *id.* ¶ 126. Although this may seem like an artful attempt improperly to divide a single claim into separate claims for breach of contract and breach of the implied covenant, the ambiguity of the contract's terms, the undeveloped nature of the factual record, and the distinction under New York law between "commercially reasonable efforts" and "good faith and fair dealing" as distinct legal standards combine to save Plaintiffs' implied covenant claim from dismissal at this stage.

Under New York law, "compliance with a 'commercially reasonable efforts' clause requires at the very least some conscious exertion to accomplish the agreed goal, but something

less than a degree of efforts that jeopardizes one's business interests." *Holland Loader Co. v. FLSmidth A/S*, 313 F. Supp. 3d 447, 473 (S.D.N.Y. 2018), *aff'd*, 769 F. App'x 40 (2d Cir. 2019). Commercially reasonable efforts is an objective standard, *Sekisui Am. Corp. v. Hart*, 15 F. Supp. 3d 359, 381 (S.D.N.Y. 2014), which should be defined within the context of a party's particular industry, *Holland Loader*, 313 F. Supp. 3d at 472.[5]

By contrast, to comply with the implied covenant of good faith and fair dealing, a party must not "do anything [that] has the effect of destroying or injuring the right of the other party to receive the fruits of the contract" or "violate the party's 'presumed intentions or reasonable expectations.'" *Spinelli*, 903 F.3d at 205 (citing *M/A–COM Sec. Corp. v. Galesi*, 904 F.2d 134, 136 (2d Cir. 1990)). When a contract gives a party discretion, the party must not "act arbitrarily or irrationally in exercising that discretion." *Id.* at 205 (quoting *Fishoff v. Coty Inc.*, 634 F.3d 647, 653 (2d Cir. 2011)). A party violates the implied covenant when its actions so directly impair the contract's value for another party "that it may be assumed that they are inconsistent with the intent of the parties," *Bank of China v. Chan*, 937 F.2d 780, 789 (2d Cir. 1991), or when it exercises its discretion under a contract to frustrate another party's rights under the agreement, deprive the other party of the value of the agreement, or benefit itself at the other party's expense, *see Pleiades Publ'g, Inc. v. Springer Sci. + Bus. Media LLC*, 117 A.D.3d 636, 637 (1st Dep't 2014). Bad faith conduct includes "evasion of the spirit of the bargain, lack of diligence and slacking off, willful rendering of imperfect performance, abuse of a power to specify terms, and interference with or failure to cooperate in the other party's performance." *Bank of China*,

---

[5]     As detailed in *Holland Loader*, the term "commercially reasonable efforts" has evaded a "settled or universally accepted definition," with New York courts not having defined the term to date and cases defining other efforts clauses "anything but a model of clarity." *Holland Loader*, 313 F. Supp. 3d at 469 (cleaned up). Further muddying the waters is the "struggle[]" courts have faced "to define the relationship between the implied obligations of good faith and fair dealing inherent in every contract and express efforts clauses." *Id.* at 470; *see also id.* at 471 ("What is also unclear is the precise relationship between a party's obligation to act in good faith and the obligation imposed by a 'commercially reasonable efforts' clause.").

937 F.2d at 789 (quoting Restatement (Second) of Contracts, § 205 cmt. d).  "Integral to a finding of a breach of the implied covenant is a party's action that directly violates an obligation that may be presumed to have been intended by the parties."  *M/A–COM Sec. Corp.*, 904 F.2d at 136.

It is plausible that a party can satisfy a commercially reasonable efforts provision while breaching an implied covenant of good faith and fair dealing, and vice versa.  *See Alto v. Sun Pharm. Indus., Inc.*, No. 19-CV-9758, 2020 WL 2086220, at *11 (S.D.N.Y. Apr. 29, 2020) (finding, at the motion to dismiss stage, that it was "conceivable" that defendant did not breach a commercially reasonable efforts provision in a contract but still breached the implied covenant).  Here, if Innogy, in fact, arbitrarily and in bad faith delayed commercial operation until after December 31, 2020, as alleged in the SAC, that conduct could feasibly have violated the implied covenant of good faith and fair dealing even if it did not breach the commercially reasonable efforts clause.  For that reason, the Court cannot dismiss Plaintiffs' implied covenant claim at this stage of the litigation.

For example, as Plaintiffs describe, Innogy could have satisfied the Merger Agreement's commercially reasonable efforts clause by completing construction of the Cassadaga Project in advance of the December 31, 2020, deadline yet nevertheless refusing to put it into commercial operation until a date beyond the deadline in order to avoid paying the Payment Milestone Award.  *See* Pls. Opp. at 14.  Similarly, some months before the December 31, 2020, deadline, recognizing that it was on pace to achieve commercial operation prior to the deadline and thus facing payment of the Payment Milestone Award, Innogy could have intentionally and in bad faith slowed development to a pace that would prevent commercial operationalization by the deadline, although still meeting the objective commercially reasonable efforts standard of the

industry.  Such conduct would plainly constitute a breach of the implied covenant, although not a breach of the explicit terms of the Merger Agreement.  At this stage of the case, absent additional detail on Innogy's conduct surrounding its alleged decision to delay commercial operation until after the December 31, 2020 deadline, the Court is unable to dismiss the breach of the implied covenant claim as duplicative.[6]  *See Stanley v. Direct Energy Servs., LLC*, 466 F. Supp. 3d 415, 430 (S.D.N.Y. 2020) (deeming the issue of whether a breach of the implied covenant claim was duplicative of a breach of contract claim "not eligible for resolution as a matter of law at the pleading stage" where facts were insufficiently developed).

### C.  An Implied Covenant of Good Faith and Fair Dealing Is Not Inconsistent with the Terms of the Merger Agreement

In a similar vein, at this stage of the litigation, the Court cannot say as a matter of law that an implied covenant of good faith and fair dealing is inconsistent with the terms of the Merger Agreement.  The implied covenant applies to a broader range of activities than the commercially reasonable efforts clause: The commercially reasonable efforts clause covers decisions concerning the pace at which the Cassadaga Project was to be developed, whereas the implied covenant reaches conduct beyond development-related decisions and actions.  Innogy's conduct, as alleged, could run afoul of the implied covenant without being subject to the

---

[6]    Although the Court will permit both claims to proceed beyond the motion to dismiss stage, Plaintiffs are now bound by their litigation strategy adopted in response to Defendants' motion.  Innogy's alleged conduct in connection with the December Milestone can support only Plaintiffs' claim for breach of the implied covenant, not a claim for breach of contract.  That is, if discovery bears out that Innogy's decision to push commercial operation of the Cassadaga Project until after the December 31, 2020, deadline was a product of unintentional missteps or other conduct that might violate a commercially reasonable efforts clause but does not support the conclusion that Innogy acted in bad faith, Plaintiffs may not pivot to pursuing that conduct as part of their breach of contract claim.  *See, e.g.*, *iWon, Inc. v. Ourhouse, Inc.*, 192 Misc. 2d 1, 3, 4–5 (Sup. Ct. Westchester Cnty. 2001) (finding plaintiff stated a claim for breach of contract by alleging that defendant breached a commercially reasonable efforts clause by "ma[king] efforts to distribute far fewer" than the number of CDs it was contractually obligated to seek to distribute).

commercially reasonable efforts clause; if so, there would be no inconsistency in implying the covenant into the Merger Agreement.

The commercially reasonable efforts clause of the Merger Agreement states, in relevant part:

> From and after Closing Date, [Innogy] shall use commercially reasonable efforts to cause [Cassadaga Wind LLC] *to continue to develop* the [Cassadaga Project] in accordance with the applicable standards of care set forth on Annex 2.  Subject to the preceding sentence, the details and manner of such *development efforts* and the schedule therefor shall be within the sole discretion of [Innogy].

Merger Agreement §7.6(a) (emphasis added).  Although section 7.6(a) of the Merger Agreement plainly requires Innogy to exercise commercially reasonable efforts to develop the Cassadaga Project — that is, to obtain the necessary permits, to complete construction, and to conduct similar tasks, *see* Merger Agreement, Annex 2 (describing standards of care for various development tasks) — it is not clear from the complaint or the Merger Agreement when "development," and by extension, the applicability of the commercially reasonable efforts clause, ends.  Building on the hypothetical discussed above, if Innogy had completed "development" of the Cassadaga Project by December 30, 2020, so that the only task left to achieve commercial operation was to flick on the neon "Open" sign on the front door, Innogy's decision to refrain from doing so until January 1, 2021, would not be governed by the commercially reasonable efforts clause; in that circumstance, subjecting Innogy's decision to the implied covenant would not be inconsistent with the express terms of the Merger Agreement.  Put differently, if "development" concludes at the point at which construction is complete and all permits have been obtained, subsequent decisions by management regarding when to start operations are not subject to the commercially reasonable efforts clause.  *See* Merger Agreement § 1.1 (defining "Commercial Operation Date" as the date on which a project, *inter alia*, "has been installed and

is fully mechanically complete," "is interconnected to the transmission grid," and "has

commenced selling commercial quantities of power").  If that were the case, Plaintiffs could,

consistent with New York law, challenge those subsequent decisions as being in violation of the

implied covenant.  Plaintiffs have, therefore, satisfied the requirement that, "to simultaneously

plead breach of contract and implied covenant claims under New York law, a plaintiff must

allege an implied duty that is consistent with the express contractual terms, but base its implied

covenant theory on allegations that are distinct from the factual predicate for its contract claims."

*JPMorgan Chase Bank, N.A. v. IDW Grp., LLC*, No. 08-CV-9116, 2009 WL 321222, at *5

(S.D.N.Y. Feb. 9, 2009).[7]

---

[7]      Even if discovery reveals that decisions regarding the timing of commercial operation were part of the "development" of the Cassadaga Project, Plaintiff potentially could still have a separate breach of the implied covenant claim, although the Court need not decide the issue at this juncture.  Although it is true that "a court cannot imply a covenant inconsistent with terms expressly set forth in the contract," and, "where the instrument contains an express covenant in regard to any subject, no covenants are to be implied in respect to the same subject," *Hartford Fire Ins.*, 723 F. Supp. at 991 (cleaned up), it is also true that where a contract contemplates the exercise of discretion, that "pledge includes a promise not to act arbitrarily or irrationally in exercising that discretion," *Dalton v. Educ. Testing Serv.*, 87 N.Y.2d 384, 389 (1995); *see also Travellers Int'l, A.G. v. Trans World Airlines, Inc.*, 41 F.3d 1570, 1575 (2d Cir. 1994) ("Even when a contract confers decision-making power on a single party, the resulting discretion is nevertheless subject to an obligation that it be exercised in good faith.").

It may be that, notwithstanding the fact that the parties included a commercially reasonable efforts clause to govern development of the Cassadaga Project, an implied covenant governing development would not necessarily be inconsistent with the explicit terms of the contract, given the requirement that parties exercise their discretion in good faith.  *See Legend Autorama, Ltd. v. Audi of Am., Inc.*, 100 A.D.3d 714, 716 (2d Dep't 2012) (holding that, where express contract clause limited defendant's discretion to open new car dealership in certain geographic locations, defendant's remaining discretion "may not be exercised in bad faith so as to frustrate the other party's right to the benefit under the agreement" (quoting *Richbell Info. Servs. v. Jupiter Partners*, 309 A.D.2d 288, 302 (1st Dep't 2003))); *Richbell Info. Servs.*, 309 A.D.2d at 302 (noting that where a plaintiff's allegations "clearly go beyond claiming only that [defendant] should be precluded from exercising a contractual right" and instead extend to "a claim that [defendant] exercised a right malevolently, for its own gain as part of a purposeful scheme designed to deprive plaintiffs of the benefits of the [contract,] . . . [t]hese allegations do not create new duties that negate [defendant's] explicit rights under a contract, but rather, seek imposition of an entirely proper duty to eschew this type of bad-faith targeted malevolence in the guise of business dealings"); *see also Travellers Int'l, A.G.*, 41 F.3d at 1575 ("[E]ven in a discretionary promotional contract, the obligation of good faith remains, and the particular duties of each party are 'derived both from the common expectations of [the] parties . . . and the relationship of those parties as structured by the contract.'" (quoting *Zilg v. Prentice-Hall, Inc.*, 717 F.2d 671, 679 (2d Cir. 1983))); *but see Serdarevic v. Centex Homes, LLC*, 760 F. Supp. 2d 322, 334–35 (S.D.N.Y. 2010) (citing *Moran v. Erk*, 11 N.Y.3d 452 (2008)) (raising the prospect that New York law will not impose limitations on a party's discretion that are not created by the language of the contract).

This case is distinguishable from the cases Defendants cite to support the proposition that courts are reluctant to imply a covenant of good faith and fair dealing in instances in which the express terms of an agreement grant a party wide discretion.  Courts are reluctant to infringe on a party's contractually-conferred discretion when doing so would bestow a benefit on the other party for which the parties had not bargained.  *See Hartford Fire Ins.*, 723 F. Supp. at 991 ("Nor can a court imply a covenant to supply additional terms for which the parties did not bargain." (citing *Metro. Life Ins. Co.*, 716 F. Supp. at 1519)).  Plaintiffs' allegations do not raise this concern.  Instead, Plaintiffs allege that Defendants acted in bad faith to undermine the mutual understanding upon which the parties' Merger Agreement was based: that the contract made economic sense only if Innogy was incentivized to commence commercial operation by the December 31, 2020 deadline.  Plaintiffs do not seek to have the Court rewrite the parties' agreement to imply additional terms; rather they seek damages to compensate them for Defendants acting in a manner that injured their rights to receive the fruits of the contract.  Here, unlike in cases such as *Hartford Fire Ins.*, 723 F. Supp. at 991, and *Metro. Life Ins. Co.*, 716 F. Supp. 16 at 1519, because Plaintiffs allege that Innogy acted with the express intent of destroying the value of the contract for Plaintiffs, their pursuit of a claim for breach of the implied covenant does not seek to impose on Innogy an implicit, never-bargained-for restriction that would accrue to Plaintiffs' benefit.  Instead, Plaintiffs seek in this claim only to protect the benefit of their express bargain.[8]

For all of these reasons, Defendants' motion to dismiss Plaintiffs' claim for breach of the implied covenant is denied.

---

[8]        *Hartford Fire Ins.* is distinguishable for another reason; in that case, the plaintiff sought to imply the covenant of good faith and fair dealing to prevent a corporate merger even though the relevant contract contained an express covenant providing that "nothing contained in this Indenture . . . shall prevent . . . any merger of the Company."  *See Hartford Fire Ins.*, 723 F. Supp. at 991.

**III.     Defendants' Motion to Dismiss Plaintiffs' Unjust Enrichment Claim Is Granted**

To state a claim for unjust enrichment under New York law, a plaintiff must allege (1)

that the defendant was enriched (2) at the plaintiff's expense and (3) "that equity and good

conscience require restitution."  *Kaye v. Grossman*, 202 F.3d 611, 616 (2d Cir. 2000) (cleaned

up).  Plaintiffs allege that Defendants were unjustly enriched because: (1) Defendants avoided

paying the Payment Milestone Amount by delaying commercial operation of the Cassadaga

Project past the December 31, 2020, deadline, SAC ¶¶ 138–139; (2) by virtue of Defendants'

conduct, Plaintiffs did not receive the $69.7 million payment that they otherwise would have

received absent Defendants' bad faith conduct, *id.* ¶¶ 138–140; and (3) equity and good

conscience demand that Defendants pay Trireme the Milestone Payment because the parties did

not contemplate the risk of the COVID pandemic or the IRS' decision to extend the availability

of the PTCs for the Cassadaga Project, *id.* ¶¶ 132–134, 139.

As with Plaintiffs' claim for breach of the implied covenant, Defendants do not argue that

Plaintiffs have failed to allege adequately an essential element of their unjust enrichment claim.

Instead, Defendants argue that Plaintiffs' unjust enrichment claim must be dismissed because a

valid contract, the Merger Agreement, clearly governs the subject matter of Plaintiffs' claim:

"when and under what circumstances Trireme is entitled to the Payment."  Defs. Mem. at 10.

Because the Court agrees with Defendants, and for the additional reason that Plaintiffs' unjust

enrichment claim is duplicative of their claim for breach of the implied covenant, Plaintiffs'

unjust enrichment claim is dismissed.

**A.  Applicable Law**

The existence of a valid and enforceable written contract that covers the subject matter at

issue precludes quasi-contract recovery for events arising out of the same subject matter.  *Clark-*

*Fitzpatrick, Inc. v. Long Island R.R. Co.*, 70 N.Y.2d 382, 388 (1987).  Put differently, an unjust

enrichment claim must be dismissed if the dispute at issue can be answered by reference to the contract. *See Gemma Power Sys., LLC v. Exelon W. Medway II, LLC*, No. 19-CV-00705, 2019 WL 3162088, at *6 (S.D.N.Y. July 1, 2019). It follows, then, that a plaintiff may not recover on an unjust enrichment claim where it can instead bring a claim for breach of contract encompassing the same subject matter. *Spirit Locker, Inc. v. EVO Direct, LLC*, 696 F. Supp. 2d 296, 305 (E.D.N.Y. 2010).[9]

A plaintiff may pursue an unjust enrichment claim when there is a bona fide dispute as to the existence of a contract or as to the contract's applicability to the dispute at issue, *Goldman v. Simon Prop. Grp., Inc.*, 58 A.D.3d 208, 220 (2d Dep't 2008); *Snitovsky v. Forest Hills Orthopedic Grp., P.C.*, 44 A.D.3d 845, 846 (2d Dep't 2007), or when it is clear that the dispute falls "sufficiently outside the terms of the contract," *EUA Cogenex Corp. v. N. Rockland Cent. Sch. Dist.*, 124 F. Supp. 2d 861, 874 (S.D.N.Y. 2000). Nevertheless, unjust enrichment is not a "catchall cause of action to be used when others fail"; "[i]t is available only in unusual situations when, though the defendant has not breached a contract nor committed a recognized tort, circumstances create an equitable obligation running from the defendant to the plaintiff." *Corsello v. Verizon N.Y., Inc.*, 18 N.Y.3d 777, 790 (2012).

**B. Application**

Plaintiffs' unjust enrichment claim must be dismissed because the Merger Agreement governs the parties' dispute and because Plaintiffs are seeking relief for the same allegedly violative conduct that underlies their claim for breach of the implied covenant.

---

[9]     By extension, a plaintiff that asserts both a breach of contract claim and an unjust enrichment claim may not pursue its unjust enrichment claim to the extent the subject matter of its claim is covered by the allegations comprising the breach of contract claim. *See In re Columbia Tuition Refund Action*, No. 20-CV-3208, 2021 WL 790638, at *9 (S.D.N.Y. Feb. 26, 2021) ("An unjust enrichment claim is not available where it simply duplicates, or replaces, a conventional contract . . . claim." (quoting *Corsello v. Verizon N.Y., Inc.*, 18 N.Y.3d 777, 790–91 (2012))).

The Merger Agreement clearly governs this issue.[10]  The Merger Agreement delineates the two circumstances under which Defendants would owe Plaintiffs the Payment Milestone Amount: (1) if Innogy reached certain development goals by October 1, 2019, or (2) if the Cassadaga Project achieved commercial operation by December 31, 2020.  Merger Agreement § 1.1.  The parties' dispute is, at base, whether Defendants owe Plaintiffs the Payment Milestone Amount notwithstanding the fact that Innogy failed to satisfy either of the triggers contained in the Merger Agreement.  Whether and when Innogy would be obligated to pay the Payment Milestone Amount is plainly a question that may be answered by reference to the contract.  *See Gemma Power Sys.*, 2019 WL 3162088, at *6.[11]  As written, the Merger Agreement does not require Innogy to pay the Payment Milestone Amount at all if the Payment Milestones are not met.

Plaintiffs' attempts to construe the dispute as arising outside the contours of the Merger Agreement are unavailing.  Plaintiffs proffer a host of allegations concerning the unforeseen impact of the COVID pandemic and the resulting changes to the IRS tax credit regime, asserting that the Merger Agreement, as drafted, is now ineffective to determine the parties' dispute because they did not anticipate a situation in which Defendants could achieve commercial operation after December 31, 2020, and still obtain the PTCs.  *See* SAC ¶¶ 132–139.  Contrary to Plaintiffs' contentions, the COVID pandemic's impact on IRS guidance has no bearing on

---

[10]  There is no dispute that the Merger Agreement exists and is a valid contract — Plaintiffs allege as much in their SAC.  *See* SAC ¶¶ 117, 136.

[11]  The Merger Agreement's language is clear and unambiguous and sets specific dates and development goals.  *See* Merger Agreement § 1.1.  Because the contractual language is unambiguous and clearly covers the dispute between the parties, this case is distinguishable from cases that Plaintiffs cite, which involve contracts containing unclear contractual provisions.  *See Bice v. Robb*, No. 07-CV-2214, 2010 WL 11586924, at *5 (S.D.N.Y. Jan. 15, 2010) (concluding that it was "far from clear" that the contract covered the disputed subject matter); *Strauss Paper Co. v. RSA Exec. Search, Inc.*, 260 A.D.2d 570, 571 (2d Dep't 1999) (stating that the contract contained "no guidelines to define the term 'best efforts'").

whether the dispute underlying Plaintiffs' unjust enrichment claim is covered by the Merger

Agreement.  While the COVID pandemic is certainly unusual, it is not the sort of "unusual

situation[]" that creates an equitable obligation running from the defendant to the plaintiff,

especially where, as here, Plaintiffs do not allege that Innogy, "though guilty of no wrongdoing,

has received money to which [it] is not entitled."  *See In re Columbia Tuition Refund Action*, No.

20-CV-3208, 2021 WL 790638, at *9 (S.D.N.Y. Feb. 26, 2021) (quoting *Corsello*, 18 N.Y.3d at

790).

Finally, Plaintiffs' unjust enrichment claim must be dismissed because it is duplicative of

Plaintiffs' claim for breach of the implied covenant of good faith and fair dealing.[12]  *See Nelson*

*v. MillerCoors, LLC*, 246 F. Supp. 3d 666, 679 (E.D.N.Y. 2017) ("[E]ven pleaded in the

alternative, claims for unjust enrichment will not survive a motion to dismiss where plaintiffs fail

to explain how their unjust enrichment claim is not merely duplicative of their other causes of

action.").  Unjust enrichment "is an equitable claim that is unavailable where an adequate

remedy at law exists."  *Bytemark, Inc. v. Xerox Corp.*, 342 F. Supp. 3d 496, 512 (S.D.N.Y. 2018)

(cleaned up).  Accordingly, an unjust enrichment claim must be dismissed if it is duplicative of a

breach of contract claim, *see In re Columbia*, 2021 WL 790638, at *9, and, under New York law,

breach of the implied duty of good faith is a breach of contract, *Fasolino Foods Co. v. Banca*

*Nazionale del Lavoro*, 961 F.2d 1052, 1056 (2d Cir. 1994) (quoting *Geler v. Nat'l Westminster*

---

[12]      This issue has come up in lawsuits brought during the pandemic by students seeking tuition refunds from their universities.  In *In re Columbia*, for example, the court rejected the student-plaintiffs' argument that Columbia University was unjustly enriched by retaining tuition and fees despite the operational changes caused by the COVID pandemic.  *In re Columbia*, 2021 WL 790638, at *9.  The court dismissed the students' unjust enrichment claims as duplicative of their breach of contract claims, rejecting plaintiffs attempt to plead unjust enrichment in the alternative because the claim was "indistinguishable" from their contract claim.  *Id.*; *see also Fedele v. Marist Coll.*, No. 20-CV-3559, 2021 WL 3540432, at * (S.D.N.Y. Aug. 10, 2021) (rejecting plaintiffs' attempt to plead unjust enrichment in the alternative where the claim sought to recover the same damages as breach of contract claim and was based on same allegedly breaching conduct and collecting cases adopting same approach).  NYU students fared no better in *Zagoria v. New York University*, No. 20-CV-3610, 2021 WL 1026511, at *5 (S.D.N.Y. Mar. 17, 2021).

*Bank USA*, 770 F. Supp. 210, 215 (S.D.N.Y. 1991)); *see also Fishoff*, 634 F.3d at 653 ("A breach

of the duty of good faith and fair dealing is considered a breach of contract.").[13]  By alleging that

Innogy breached the implied covenant of good faith and fair dealing inherent in every contract,

Plaintiffs allege that Innogy breached the contract itself.

Here, Plaintiffs' unjust enrichment claim is predicated entirely on the same facts that

underpin its breach of the implied covenant claim.  In support of their claim for breach of the

implied covenant, Plaintiffs allege that, *inter alia*, "[b]y choosing to achieve commercial

operation of the Cassadaga Project only two months after December 31, 2020, notwithstanding

Innogy's ability to achieve commercial operation of the project before that date, Innogy

purposefully, and in bad faith, violated the parties' intentions and reasonable expectations as to

the Cassadaga Project Payment Milestone in an effort to obtain a $69.7 million windfall based on

the IRS' unanticipated and unprecedented response to the Covid-19 pandemic."  SAC ¶ 126.

Similarly, in support of their claim for unjust enrichment, Plaintiffs allege that, *inter alia*,

"Innogy has been enriched at Trireme's expense by manipulating the Cassadaga Project's

commercial operation date to take unfair advantage of the Covid-19 pandemic and reap a $69.7

million windfall."  *Id.* ¶ 139.  While worded slightly differently, the substance of Plaintiffs'

allegations underlying each claim is the same: following the change in IRS rules, Defendants,

acting in bad faith, intentionally manipulated the timetable for the commencement of commercial

operations in order to avoid paying Plaintiffs $69.7 million while still collecting the PTCs for

themselves.  Because the conduct that Plaintiffs allege in their unjust enrichment claim is

---

[13]     *See also Comprehensive Habilitation Servs., Inc. v. Com. Funding Corp.*, No. 05-CV-9640, 2009 WL
935665, at *10 n.14 (S.D.N.Y. Apr. 7, 2009) (describing the implied covenant of good faith and fair dealing as "a
contractual cause of action"); *Emposimato v. CIFC Acquisition Corp.*, 30 Misc. 3d 1233(A), 2011 WL 833801, at
*11 (Sup. Ct. N.Y. Co. Mar. 7, 2011) ("A claim for breach of the implied covenant is, itself, a type of breach of
contract claim.  The distinguishing characteristic of a claim for breach of the implied covenant is merely that . . . a
claim for breach of the implied covenant alleges the breach of a contract term which is not express, but should be
implied.").

captured by Plaintiffs' breach of the implied covenant claim, and because the damages sought are identical, there can be no standalone claim for unjust enrichment. *See Nelson*, 246 F. Supp. 3d at 679.

Accordingly, Plaintiffs' unjust enrichment claim is dismissed.

## IV.    Defendants' Motion to Dismiss Plaintiffs' Reformation Claim Is Granted

Plaintiffs assert that they would not have entered into the Merger Agreement had the parties not intended for "December 31, 2020" to operate as a proxy for the "expiration of the tax credits." SAC ¶ 150. Consequently, Plaintiffs seek reformation of the Merger Agreement to comport with their understanding of the parties' bargain. *See id.* ¶ 152. Defendants, for their part, argue that Plaintiffs' claim rests on a failure to anticipate a future change in law rather than on a mutual mistake, precluding reformation of the contract. Defs. Mem. at 12–13. The Court agrees with Defendants and, therefore, dismisses Plaintiffs' claim for reformation.

### A.   Applicable Law

A claim for reformation must be premised on either a mutual mistake or a fraudulently induced unilateral mistake. *Pilkington N. Am., Inc. v. Mitsui Sumitomo Ins. Co. of Am.*, 460 F. Supp. 3d 481, 492 (S.D.N.Y. 2020) (quoting *Greater N.Y. Mut. Ins. Co. v. U.S. Underwriters Ins. Co.*, 36 A.D.3d 441, 443 (1st Dep't 2007)). The mistake must exist at the time of contracting and be substantial. *Gould v. Bd. of Educ. of Sewanhaka Cent. High Sch. Dist.*, 81 N.Y.2d 446, 453 (1993). To allege adequately mistake, a party "must state with particularity the circumstances constituting . . . [the] mistake." Fed. R. Civ. P. 9(b). Allegations lack the requisite "particulars" required under Rule 9(b) when they "fail to specify the time, place, speaker, and sometimes even the content of the alleged representations." *Sazerac Co.. v. Falk*, 861 F. Supp. 253, 260 (S.D.N.Y. 1994) (quoting *Luce v. Edelstein*, 802 F.2d 49, 54 (2d Cir. 1986)); *see also Mills v. Everest Reinsurance Co.*, 410 F. Supp. 2d 243, 248 (S.D.N.Y. 2006)

(applying this standard in the mutual mistake context).  There is a heavy presumption that an executed written contract manifests the true intention of the parties; consequently, a party proposing reformation must demonstrate "in no uncertain terms" what the parties really agreed to and prove that a mistake occurred.  *Winmar Co. v. Tchrs. Ins. & Annuity Ass'n of Am.*, 870 F. Supp. 524, 535 (S.D.N.Y. 1994) (quotation omitted).

A "party's prediction or judgment as to events to occur in the future, even if erroneous, is not a 'mistake' as that word is" used in the context of demonstrating the existence of a mutual mistake upon which reformation may be granted.  *Hartford Fire Ins.*, 723 F. Supp. at 994 (quoting Restatement (Second) of Contracts § 151 cmt. a).  This rule holds even when future changes seem unlikely at the time of contracting.  *P.K. Dev., Inc. v. Elvem Dev. Corp.*, 226 A.D.2d 200, 202 (1st Dep't 1996) (denying rescission[14] of a contract because "[t]he failure of events to develop or continue as expected—no matter how well-founded the expectation—does not entitle the disappointed party to rescission or avoidance of the contract" (citation omitted)).  "[T]he mere fact that a change in the law works to the advantage of one of the contracting parties does not alone entitle the other party to an adjustment of his contractual rights or duties so as to neutralize the [e]ffect of such a change."  *Gimbel Bros., Inc. v. Brook Shopping Ctrs., Inc.*, 118 A.D.2d 532, 534 (2d Dep't 1986).

### B.  Application

Plaintiffs' reformation claim must be dismissed because it is premised on a failure to anticipate future events, which cannot support a claim of mutual mistake.  Plaintiffs argue, essentially, that the Merger Agreement should be reformed because the IRS' change to its tax

---

[14]     Like claims for reformation of contract, claims for rescission of a contract must be predicated on either mutual mistake or fraudulently induced unilateral mistake.  *Goldberg v. Mfrs. Life Ins. Co.*, 242 A.D.2d 175, 179 (1st Dep't 1998).

credit program in response to the COVID pandemic made it economically advantageous for Innogy to achieve commercial operation of the Cassadaga Project after December 31, 2020, which the parties did not foresee or intend.  The Court may not grant reformation on this basis.

Plaintiffs' description of the alleged mutual mistake asserted in their brief conflicts with the articulation contained in their complaint.  In their opposition brief, Plaintiffs assert that "the claim is not that the parties did not foresee the future" but rather that the Merger Agreement does not represent a meeting of the minds because the parties committed a mutual mistake by "writing 'December 31, 2020' instead of 'the day the tax credits expire.'"  Pls. Opp. at 16.  Plaintiffs' complaint, however, repeatedly alleges that the parties "mistakenly believed, in reliance on then-existing IRS guidance," that Innogy could only obtain the PTCs if the Cassadaga Project achieved commercial operation no later than December 31, 2020.  *E.g.,* SAC ¶¶ 143, 144.  Even in their brief, Plaintiffs argue that "the parties' mutual mistake about the expiration of the safe harbor 'pervade[d] the entire transaction.'"  Pls. Opp. at 18 (quoting *Gould*, 81 N.Y.2d at 453).  Clearly, then, Plaintiffs' description of the mutual mistake as one based on poor drafting is just a belated attempt to avoid the seemingly inevitable result if the mistake is (accurately) described as a failure to anticipate that the IRS might change the date on which the tax credits would no longer be available.  At the very least, the alleged drafting error is contingent on, or a manifestation of, the central mutual mistake of failing to anticipate changes to IRS guidance.  As discussed below, the mutual failure to anticipate that the law might change does not, as a matter of law, constitute a mutual mistake entitling a party to reformation.[15]

---

[15]     Even if the Court were to accept that the mistake was an error in drafting, Plaintiffs have not pled facts with the necessary particularity to comport with Federal Rule of Civil Procedure 9(b).  *See Sazerac*, 861 F. Supp. at 260 (citing *Luce*, 802 F.2d at 54) (plaintiffs failed to satisfy the particularity requirement because they did not allege when or to whom certain fraudulent representations were made or identify relevant meetings or negotiations).

As correctly construed, then, Plaintiffs' alleged "mutual mistake" relies on an erroneous "prediction or judgment as to events to occur in the future," which does not, as a matter of law, constitute a mutual mistake warranting contract reformation. *Hartford Fire Ins.*, 723 F. Supp. at 994 (quotation omitted). First, the parties' failure to anticipate the onset of a worldwide pandemic that would have an impact on their deal is a mistaken, if understandable, assumption about the future; it does not overcome the heavy presumption that the plain language of a contract captures the complete intentions of the parties. *See Gap Inc. v. Ponte Gadea N.Y. LLC*, No. 20-CV-4541, 2021 WL 861121, at *12 (S.D.N.Y. Mar. 8, 2021) ("[Plaintiff's] claim that, had it anticipated the limitations imposed by the COVID-19 pandemic in advance, it would not have entered the Lease (at least on the same terms), is not sufficient to support a 'mutual mistake' affirmative defense under New York law."). The failure to anticipate a future factual development does not warrant contract reformation. *Id.*

Similarly, the parties' alleged failure to anticipate that the IRS might amend the tax-credit regime is also not a mutual mistake warranting reformation, even though the regulatory change seemed entirely unlikely at the time of contracting. *See P.K. Dev., Inc.*, 226 A.D.2d at 202; *see also de la Gueronniere v. Simon*, No. 97-CV-4813, 1998 WL 226199, at *3 (S.D.N.Y.) (holding that mistaken assumptions as to the happening of future events do not rise to the level of mutual mistake), *aff'd*, 166 F.3d 1199 (2d Cir. 1998); *Black v. Gen. Wiper Supply Co.*, 305 N.Y. 386, 393–94 (1953) (denying plaintiff-landlord reformation of a lease where a city imposed new sewer rental fees on landlords, which the landlord would likely have passed on to tenants had the regulatory change been foreseen); *Thor Props., LLC v. Chetrit Grp. LLC*, 91 A.D.3d 476, 478 (1st Dep't 2012) (dismissing claim because "it was always uncertain whether the City would permit or deny further development of the property"). At the time of contracting, the parties

anticipated that the governing regulatory regime on tax credits might change in some way. *See* SAC ¶ 59 ("[T]he parties specifically discussed and negotiated contingency provisions dealing with the situation where the government made an 'Adverse Change in [Tax] Law.'"); Merger Agreement § 1.1 (defining "Adverse Change in PTC Law"). Although an extension of PTC availability might have been highly unlikely, there can be no contention that it would *never* occur. Plaintiffs are, in effect then, seeking reformation because "a change in the law work[ed] to the advantage of" Innogy; but a party is not entitled to reformation "so as to neutralize the [e]ffect of such a change." *Gimbel Bros.*, 118 A.D.2d at 534–35. Because Plaintiffs' claim rests on the parties' failure to foresee a future change in the tax-credit landscape, their reformation claim fails as a matter of New York law.[16]

    For all the above reasons, Plaintiffs' reformation claim is dismissed.

## V.   Defendants' Motion to Dismiss Plaintiffs' Tortious Interference Claim Against Cassadaga Wind LLC Is Granted

    Unlike Plaintiffs' claims for breach of the implied covenant, unjust enrichment, and reformation, Plaintiffs' tortious interference claim is nominally independent of Defendants' conduct in connection with the December Milestone and the ongoing COVID pandemic. Instead, Plaintiffs assert that Cassadaga Wind LLC, as the designated "Project LLC" for the Cassadaga Project, tortiously interfered with the Merger Agreement by improperly preventing Innogy from achieving the Payment Milestones. SAC ¶ 161. The complaint alleges that

---

[16]    Similarly unavailing is Plaintiffs' argument that New York courts have allowed reformation claims in "analogous" cases where the parties were mistaken as to the contract's fundamental bargain. *See* Pls. Opp. at 17–18. The cases that Plaintiffs rely upon are distinguishable because they concern misconceptions about factual or legal circumstances existing *at the time of contracting*. *See Winmar Co.*, 870 F. Supp. at 536; *Gould*, 81 N.Y.2d at 453; *County of Orange v. Grier*, 30 A.D.3d 556, 557 (2d Dep't 2006); *Mahon v. N.Y.C. Health & Hosps. Corp.*, 303 A.D.2d 725, 725 (2d Dep't 2003). In comparison, Plaintiffs' claim rests on a misconception about the possibility that the IRS would change its guidance *in the future*.

Cassadaga Wind LLC's alleged tortious conduct occurred only in connection with the alleged breach relative to achieving the October Milestone.  *See id.* ¶ 100.

Defendants seek dismissal of Plaintiffs' tortious interference claim against Cassadaga Wind LLC on three separate theories: (1) Plaintiffs have failed adequately to allege that Cassadaga Wind LLC caused Innogy to breach the Merger Agreement; (2) Cassadaga Wind LLC is shielded from liability because it had an "economic interest" in Innogy's business;[17] and (3) Cassadaga Wind is shielded from liability because it acted as an agent of its corporate parent, Innogy.[18]  *See* Defs. Mem. at 14–20.  Because Plaintiffs have failed to plead adequately that Cassadaga Wind LLC caused Innogy's breach, let alone that Cassadaga Wind LLC employed wrongful means to do so, Plaintiffs' tortious interference claim is dismissed, and the Court need not reach Defendants' proffered defenses.

### A.  Applicable Law

Under New York law, to plead a claim for tortious interference with contract, a plaintiff must allege: (1) "the existence of a valid contract between the plaintiff and a third party"; (2) "the defendant's knowledge of the contract"; (3) the "defendant's intentional procurement of the third-party's breach of the contract without justification";[19] (4) "actual breach of the contract";

---

[17]     When a defendant has an economic interest in a contract, a plaintiff must meet a heightened standard for pleading and proving tortious interference.  *See Masefield AG v. Colonial Oil Indus.*, No. 05-CV-2231, 2006 WL 346178, at \*5 (S.D.N.Y. Feb. 15, 2006).  The heightened pleading standard requires that a plaintiff allege facts from which it can plausibly be inferred that the defendant's interference was malicious or involved fraud or criminality.  *Id.*

[18]     A defendant may not be held liable for tortious interference if it acted within the scope of its authority as an agent of the contracting party unless it committed an independent tortious act against the plaintiff.  *See Albert v. Loksen*, 239 F.3d 256, 275 (2d Cir. 2001).

[19]     Although ultimately not dispositive because Plaintiffs failed to allege any conduct supporting the conclusion that Cassadaga Wind LLC procured Innogy's breach, contrary to Plaintiffs' assertions that they were not required to plead "but for" causation, the Second Circuit has recognized as recently as 2019 that but for causation is required to plead tortious interference under New York law.  *See Maricultura Del Norte, S. de R.L. de C.V. v. Umami Sustainable Seafood, Inc.*, 769 F. App'x 44, 54 (2d Cir. 2019) ("A plaintiff must allege that there would not have been a breach [of contract] but for the activities of defendants.") (quoting *Sharma v. Skaarup Ship Mgmt.*

and (5) "damages resulting therefrom." *Kirch v. Liberty Media Corp.*, 449 F.3d 388, 401–02 (2d

Cir. 2006) (quoting *Lama Holding Co. v. Smith Barney Inc.*, 88 N.Y.2d 413, 424 (1996)).  To

allege that a defendant intentionally procured a breach of contract, a plaintiff must allege that the

defendant took some "specific action" to cause the third party to breach the contract.  *See*

*Masefield AG v. Colonial Oil Indus.*, No. 05-CV-2231, 2006 WL 346178, at *4–5 (S.D.N.Y.

Feb. 15, 2006).  A plaintiff must additionally allege that the defendant "used wrongful means to

induce [the third party] to breach the contract."  *Ace Arts, LLC v. Sony/ATV Music Publ'g, LLC*,

56 F. Supp. 3d 436, 450 (S.D.N.Y. 2014) (cleaned up).  "'Wrongful means' includes physical

violence, fraud, or misrepresentation, civil suits and criminal prosecutions, and some degrees of

economic pressure." *Orange Cnty. Choppers, Inc. v. Olaes Enters., Inc.*, 497 F. Supp. 2d 541,

562 (S.D.N.Y. 2007) (quoting *Guard-Life Corp. v. S. Parker Hardware Mfg. Corp.*, 50 N.Y.2d

183, 191 (1980)).  Wrongful means does not include persuasion alone, even if it is knowingly

directed at interfering with a contract.  *Guard-Life*, 50 N.Y.2d at 191.

### B.  Application

Plaintiffs failed to allege that Cassadaga Wind LLC used wrongful means to induce

Innogy to breach the Merger Agreement.  Plaintiffs have not alleged any type of conduct either

expressly included in or closely analogous to New York law's definition of wrongful means.

Plaintiffs merely allege that Innogy, through Cassadaga Wind LLC, submitted delinquent

compliance filings.  *See* SAC ¶¶ 71–100.  That is plainly insufficient to qualify as wrongful

means, and, for that reason alone, Plaintiffs' claim for tortious interference must be dismissed.

---

*Corp.*, 916 F.2d 820, 828 (2d Cir. 1990)).  Plaintiffs' cited cases are not contrary to this point. *Union Carbide Corp. v. Montell N.V.* holds that parties must allege but for causation in substance, 944 F. Supp. 1119, 1138 (S.D.N.Y. 1996), and *Kronish Lieb Weiner & Hellman LLP v. Tahari, Ltd.*, holds only that plaintiffs need not plead that the defendant's conduct was the "sole proximate cause" of the alleged harm, 35 A.D.3d 317, 318 (1st Dep't 2006).

Not only do Plaintiffs fail to allege that Cassadaga Wind LLC used wrongful means, Plaintiffs also fail to allege that Cassadaga Wind LLC took *any* specific action of its own to procure Innogy's breach.  Contrary to Plaintiffs' argument that Cassadaga Wind "improperly prevented achievement of the conditions under which Innogy would owe the Milestone Payment . . . ***through its own intentional delay*** in submitting the necessary permit filings," Pls. Opp. at 22, there are no specific allegations in the SAC that Cassadaga Wind acted independently of Innogy in any way.  Throughout their SAC, Plaintiffs repeatedly refer to Innogy as taking actions *through* Cassadaga Wind LLC.  *See, e.g.*, SAC ¶¶ 77, 78, 81, 88, 89, 91, 93, 94.  As Defendants correctly note, Plaintiffs' complaint treats Cassadaga Wind LLC as "the holding company for the Cassadaga Project through which [Innogy] developed and obtained permits for the project" rather than a stranger to the contract capable of tortious interference.  Defs. Mem. at 15 (citing SAC ¶¶ 24, 37, 38, 73, 77, 78, 81, 89, 92, 92, 93, 94); *see also, e.g.*, *Koret, Inc. v. Christian Dior, S.A.*, 161 A.D.2d 156, 157 (1st Dep't 1990) ("It is well established that only a stranger to a contract, such as a third party, can be liable for tortious interference with a contract.").  Plaintiffs' other allegations concerning Cassadaga Wind LLC's conduct are entirely conclusory and are insufficient to allege that Cassadaga Wind LLC took any action of its own to cause Innogy to breach the Merger Agreement.  *See* SAC ¶ 100 ("In connection with Innogy's and its own intentional delay, Cassadaga Wind LLC has tortiously interfered with the Merger Agreement to deprive Plaintiffs of the Payment Milestone Amount."); *id.* ¶ 161 ("As the designated 'Project LLC' for the Cassadaga Project, Cassadaga Wind LLC has intentionally and improperly prevented achievement of the Payment Milestones to deny Trireme Energy Development, LLC the Cassadaga Project Payment Milestone Amount under the Merger Agreement, and in doing so has tortiously interfered with the Merger Agreement."); *see also*

32

*Masefield AG*, 2006 WL 346178, at *4–5 (requiring "specific action" by a defendant to procure a breach of contract); *A.V.E.L.A., Inc. v. Est. of Marilyn Monroe, LLC*, No. 12-CV-4828, 2018 WL 1273343, at *11 (S.D.N.Y. Mar. 5, 2018) ("Under New York law, it is insufficient, for purposes of stating a viable claim for tortious interference with contract, to allege in conclusory terms that a contract existed and was breached.").

Accordingly, Plaintiffs' tortious interference claim is dismissed.

## CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss is DENIED IN PART and GRANTED IN PART.  The parties are ordered to appear for the previously scheduled pretrial conference on October 8, 2021, at 10:30 a.m.

The Clerk of Court is respectfully directed to terminate the open motion at Dkt. 44.


**SO ORDERED.**

**Date:  August 17, 2021**
          **New York, NY**
                                                **VALERIE CAPRONI**
                                  **United States District Judge**