UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

TRIREME ENERGY HOLDINGS, INC. and
TRIREME ENERGY DEVELOPMENT, LLC,

                        Plaintiffs,

          -against-

INNOGY RENEWABLES US LLC and
INNOGY SE,

                     Defendants.

Case No. 1:20-cv-05015 (JLR)

**OPINION AND ORDER**

JENNIFER L. ROCHON, United States District Judge:

This case is about the rights and obligations under a merger agreement between renewable-energy developers regarding the construction of a wind farm in western New York known as the Cassadaga Project. Trireme Energy Holdings, Inc. and Trireme Energy Development, LLC (together, "Plaintiffs" or "Trireme"), formerly the owners of several renewable-energy projects in the United States, including the Cassadaga Project, bring this action against their merger-agreement counterparty, Innogy Renewables US LLC ("IRUS") and its parent company, Innogy SE ("Innogy" and, together, "Defendants").[1] Although Trireme has asserted various claims throughout this case, only two remained at the time of the bench trial before this Court.

First, Trireme claims that IRUS breached the covenant of good faith and fair dealing implied in the parties' merger agreement (the "implied-covenant claim") by failing to achieve

---

[1] During this litigation, IRUS was acquired by a German energy company called RWE AG and subsequently merged into an RWE AG subsidiary called RWE Renewables LLC ("RWE"). The parties do not dispute that RWE adopted IRUS's obligations and liabilities after the acquisition. Therefore, unless the distinction is material, the Court will refer to both RWE and IRUS as "IRUS."

commercial operation of the Cassadaga Project until after December 31, 2020, in order to escape its obligation to make a $67.9 million milestone payment to Plaintiffs. ECF No. 43 (the "SAC") ¶¶ 116-129. Second, Trireme claims that IRUS breached the merger agreement by failing to timely provide Trireme with certain information regarding the development of the Cassadaga Project. *Id.* ¶¶ 153-157. Trireme also seeks a declaration that Innogy must honor its guarantee as IRUS's parent company to pay damages under the contract. *Id.* at 31. All other claims in this case have been dismissed.

The Court held a bench trial on the surviving claims from November 13 to 17, 2023. Having considered the parties' pretrial and post-trial submissions and the evidence presented at trial, the Court enters judgment in favor of Defendants, concluding that Plaintiffs have failed to prove by a preponderance of the evidence that IRUS acted in bad faith to delay construction of the Cassadaga Project for the purpose of depriving Plaintiffs of the milestone payment. The Court also finds no breach of contract as to IRUS's reporting requirements. Finding no obligation on the part of IRUS, Plaintiffs' request for a declaration regarding Innogy's guarantee, is denied.

## PROCEDURAL HISTORY

Plaintiffs filed their initial complaint on June 30, 2020, asserting claims against Defendants for breach of contract, tortious interference, and unjust enrichment, as well as seeking a declaration that Innogy is liable for IRUS's damages under the contract. ECF No. 1. On January 13, 2021, Plaintiffs filed the SAC, which is the operative version of the complaint. The SAC expanded on Plaintiffs' pre-existing claims and added claims for reformation and breach of the implied covenant of good faith and fair dealing. *See generally* SAC. Defendants moved to dismiss Plaintiffs' claims for breach of the implied covenant, unjust enrichment, reformation, and tortious interference; they did not move to dismiss Plaintiffs'

breach-of-contract claim.  *See* ECF Nos. 44-45.  On August 17, 2021, this Court granted in

part and denied in part Defendants' motion to dismiss.  *See Trireme Energy Holdings, Inc. v.*

*Innogy Renewables US LLC*, No. 20-cv-05015 (VEC), 2021 WL 3668092, at *1 (S.D.N.Y.

Aug. 17, 2021).  The Court dismissed Plaintiffs' claims for unjust enrichment, reformation,

and tortious interference, but declined to dismiss Plaintiffs' claim for breach of the implied

covenant.  *See id.* at *3-17.

    On September 16, 2022, Defendants moved to exclude the testimony of three of

Plaintiffs' expert witnesses and to strike selected testimony from another expert witness's

report.  ECF No. 170.  On September 27, 2022, this case was reassigned to the undersigned.

ECF No. 173.  The Court granted Defendants' motion in part and disallowed a small portion

of the expert testimony, but otherwise permitted the remaining expert testimony to be

presented at trial.  ECF No. 198.

    On June 30, 2023, the parties jointly stipulated to the dismissal of Plaintiffs' breach-

of-contract claim alleging that IRUS failed to exercise commercially reasonable efforts to

develop the Cassadaga Project.  ECF No. 212.  Therefore, the only remaining claims to be

tried were Plaintiffs' claim for breach of the implied covenant of good faith and fair dealing,

and a limited breach-of-contract claim asserting that IRUS breached the merger agreement by

failing to comply with certain reporting requirements as to the project's development.

    On September 15, 2023, the parties filed their joint pretrial order and each party

submitted proposed findings of fact and conclusions of law.  *See* ECF Nos. 224-26.  The

Court conducted a final pretrial conference on November 7, 2023.  The Court held a bench

trial from November 13 to November 17, 2023, during which it received live testimony from

seven witnesses, testimony through deposition designations from six other witnesses (some

via video), and hundreds of exhibits.[2]  On November 28, 2023, the parties updated their

proposed findings of fact and conclusions of law.  *See* ECF Nos. 253-54.  The Court heard

closing statements and oral argument on November 29, 2023.

Pursuant to Rule 52(a) of the Federal Rules of Civil Procedure, the Court makes the

following findings of fact and conclusions of law.

**FINDINGS OF FACT[3]**

### I.   The Parties and Relevant Non-Parties

In 2009, Trireme Energy Development, LLC acquired EverPower Wind Holdings, Inc.

("EverPower"), a renewable-energy company that developed, owned, and operated wind

farms throughout the United States.  Tr. at 88:21-89:5.  Through Trireme Energy Holdings,

Inc., a British private-equity firm called Terra Firma Capital Partners Fund Three, LLP

("Terra Firma") owns about 95 percent of the Trireme entities; James Spencer, EverPower's

founder and Trireme's CEO, owns the remaining 5 percent.  *See id.* at 89:18-25, 156:10-11.

Trireme operated each of its projects through a different special-purpose entity; the project at

issue in this case was developed through a special-purpose entity known as Cassadaga Wind

LLC.  *See* PX 152.

In December 2017, Trireme sold EverPower's assets.  Its six wind farms already in

operation were sold to BlackRock, Inc., while IRUS purchased EverPower's portfolio of

projects in development.  Tr. at 99:14-17, 293:9-21.  At the time, IRUS was the U.S.

subsidiary of Innogy, a German energy company.  *See* PX 27 ("Young Dep.") at 28:9-19.

---

[2] Citations to "PX" refer to a plaintiff exhibit; "DX" to a defendant exhibit; "Tr." to the trial transcript; and "Dep." to deposition designations of the person indicated.  Unless otherwise indicated, where the Court cites testimony here, it has credited that testimony.

[3] The Court's findings of fact are primarily contained in this section but appear as well in its conclusions of law.

4

Later, on July 1, 2020, a German utility company, RWE AG, acquired IRUS, which was eventually merged into a subsidiary of RWE Renewables Americas, itself a subsidiary of RWE AG.  *See* Tr. at 249:21-250:2; PX 310.

## II.   The Merger Agreement

On December 17, 2017, Trireme and IRUS entered into an agreement under which IRUS acquired from Plaintiffs a portfolio of approximately 40 renewable-energy projects in development.  *See* PX 1 (the "Merger Agreement" or "Agreement"); Tr. at 105:15.  Among the most valuable of the projects under development was the Cassadaga Project, a proposed 125-megawatt wind farm, consisting of 37 wind turbines, in Chautauqua County, New York.  *See* Tr. at 106:14, 686:7-8, 856:3.

In exchange for the renewable-energy portfolio, IRUS agreed to pay Trireme $50 million upfront, plus an additional payment "in an aggregate amount of up to $112,200,000, if any," which was conditioned on various milestones associated with the development and construction of the projects (the "Milestone Payment").  Agreement § 3.1.  The potential Milestone Payment associated with the Cassadaga Project was $69.7 million.  *Id.* § Annex 1.

The Merger Agreement reflects the following regarding milestones for the Cassadaga Project:

> "Payment Milestone" means . . . with respect to the Cassadaga Project, either (x) prior to October 1, 2019, either (1) the occurrence of the events listed in Section C(1) of Annex 1 or (2) the Cassadaga Project has obtained a valid, enforceable interconnection agreement and construction agreement and a full notice to proceed under such construction contract has been issued for construction of the Cassadaga Project or (y) the Cassadaga Project shall have reached its Commercial Operation Date on or before December 31, 2020.

*Id.* § 1.1.  In sum, the Merger Agreement provided that IRUS would pay an additional $69.7 million to Trireme if the Cassadaga Project had: (1) by October 1, 2019, among other things,

received an enumerated list of permits and approvals necessary to begin construction (the "October Milestone"); or (2) reached its "Commercial Operation Date" (the "COD") by December 31, 2020 (the "December Milestone"). *Id.* The October Milestone is not at issue in this case.

With respect to the December Milestone, the Merger Agreement defined the COD as the date on which a project is "mechanically complete," "interconnected to the transmission grid," and, among other things, "has commenced selling commercial quantities of power." *Id.* In other words, IRUS would owe Plaintiffs $69.7 million under the Merger Agreement's December Milestone if it completed construction and began to operate the Cassadaga Project on or before December 31, 2020.

Section 7.6(a) of the Merger Agreement further provides that IRUS "shall use commercially reasonable efforts . . . to continue to develop the Key Projects [including the Cassadaga Project] in accordance with the applicable standards of care set forth on Annex 2." *Id.* § 7.6(a). Annex 2, in turn, lists four goals that IRUS was required to use "commercially reasonable efforts" to seek to achieve. Each of those goals relates to pre-construction matters addressed at the development stage, such as maintaining the project's land rights and its existing power-purchase agreements (under which the project would sell the electricity that it generated), and continuing with the process to acquire the permits necessary to begin construction. *Id.* § Annex 2. Even with respect to these goals, Section 7.6(a) adds that "the details and manner of such development efforts and the schedule therefor shall be within the sole discretion of [IRUS]." *Id.* § 7.6(a). If IRUS "determine[d] to cease development of and abandon" a "Key Project" (such as the Cassadaga Project) before October 1, 2019, it needed only to provide notice to Plaintiffs of its intent to do so, after which it would "have no further obligation with respect to development" of that project. *Id.*

The Merger Agreement also requires IRUS to "keep [Plaintiffs] informed on a reasonable, periodic basis, but no less frequently than quarterly, regarding the development of [the Cassadaga Project], by delivering information" in an agreed-upon form to James Spencer, Plaintiffs' designated representative.  *Id.* § 7.6(b).  In the same section, the Merger Agreement adds that "Purchaser shall also reasonably cooperate with [Spencer] to respond to [Spencer's] reasonable ad-hoc inquiries regarding the development of [the Cassadaga Project]; provided however, [Spencer] shall limit such inquiries to a reasonable level, taking into account the stage of development of the applicable Key Project."  *Id.*

Also relevant in the Merger Agreement is a choice-of-law provision, which provides that "any claim or controversy directly or indirectly based upon or arising out of this Agreement . . . , including all matters of construction, validity and performance, shall be governed by and interpreted and enforced in accordance with the laws of the State of New York."  *Id.* § 13.5.

Finally, the Merger Agreement contains an integration clause, which states that the agreement "set[s] forth the entire understanding of the Parties hereto with respect to the transactions contemplated hereby" and "supersede[s]" "[a]ny and all previous agreements and understandings between or among the Parties regarding the subject matter hereof, whether written or oral."  *Id.* § 13.9.

On December 21, 2017, Innogy and Trireme entered into a parent guarantee under which Innogy "irrevocably and unconditionally guarantees . . . the payment when due of [IRUS's] payment obligations arising under the [Merger Agreement]."  PX 4 (the "Parent Guarantee" or "Guarantee") § 2.1.

### III.    Overview of Relevant Tax Credits

To encourage investment in the development of renewable energy, Congress has issued tax credits to qualifying wind-energy projects.  Tr. at 393:11-22.  At the time of the Merger Agreement, the Internal Revenue Service (the "IRS") provided two types of tax credits to qualifying wind-energy projects: Production Tax Credits ("PTCs") and Investment Tax Credits ("ITCs").  *Id.* at 393:23-394:6.  The PTCs available for a given project are determined by the electricity produced from the facility, while ITCs are calculated as a percentage of a project's qualifying capital expenditures.  *Id.*

For a project to obtain the credits, the IRS requires that continuous efforts be undertaken to build and develop each facility, but provides a safe harbor such that if the project is completed within a specified period, it is deemed to have met the continuity requirement.  *Id.* at 397:7-25.  Under then-operative IRS guidance, a project was deemed to begin undertaking such efforts in the first year in which the project spent at least five percent of its final qualifying costs, such as by purchasing turbines and other equipment.  *Id.* at 396:2-15.  Placing a facility into service within four calendar years after construction began would bring the project within the safe harbor.  *Id.* at 397:20-25.  For example, a $100 million wind farm would qualify for the 2016 tax-credit safe harbor if the owner purchased at least $5 million of wind turbines in 2016 and placed those turbines into service at the wind farm no later than December 31, 2020.  If the project achieved COD after December 31, 2020, the project would not fall within the IRS's safe harbor.  *Id.* at 398:6-11.  The developer could still receive the full value of the applicable tax credits, but it would need to demonstrate to the IRS that it had undertaken continuous efforts to place the project into service, rather than rely on the "cut-and-dried" safe harbor.  *Id.* at 763:13-20, 764:12-20.  The developer could also apply for tax credits on a turbine-by-turbine basis.  *Id.* at 428:4-21. For projects that began

construction in 2017 or later, the original amount of available renewable-energy tax credits

decreased by 20% for each year after 2016 that the project began construction, until the tax

credits were phased out.  *Id.* at 430:25-431:1-10.

## IV.  The Parties Tie the December Milestone to a Specific Date Rather than Receipt of Tax Benefits

At the time that the Merger Agreement was executed, the parties understood that IRUS

would receive a financial benefit in the form of tax credits if the Cassadaga Project were to

achieve COD by December 31, 2020.  *See id.* at 129:8-9, 262:13-19; Young Dep. at 222:8-12,

351:5-13.  Internally, Trireme confirmed that the potential tax credits should create a financial

incentive for IRUS to complete a project in 2020, even if it had to pay a corresponding

milestone payment.  *See* PX 545.  These calculations helped assure Trireme that IRUS

"wouldn't stall and build the pipeline" of projects in development so they "don't have to pay

[the] earn-out[s]."  *Id.* at 1.  In the executed agreement, however, the December Milestone was

not linked to IRUS's receipt of tax credits; rather, it was triggered only if the Cassadaga

Project reached COD by December 31, 2020.  *See* Agreement § 1.1, at 11.

During negotiations about the Merger Agreement, Trireme executives debated among

themselves (and with their advisors) about the expiration date for the Milestone Payment.

*See, e.g.*, DX 13; DX 67.  Trireme's CEO, Spencer, did not want an expiration date associated

with the Milestone Payment.  *See* DX 67; Tr. at 181:4-15.  Trireme also considered asking for

a Milestone Payment formula that still provided Trireme with a percentage of the Milestone

Payment in case the Cassadaga Project reached COD after 2020, prorated by the percentage of

tax credits available for that year during which the project eventually reached COD.  DX 13

at 2.  However, Barclays – the investment bank hired to advise Plaintiffs on the Merger

Agreement – disagreed and recommended including a specific December 31, 2020 COD as

the milestone trigger. *See id.* at 1; Tr. at 310:11-313:9. Ross Brinklow, a principal at Terra Firma, accepted Barclays's recommendation, and the Merger Agreement ultimately provided for a December Milestone based on COD by December 31, 2020, untethered to the receipt of tax credits. Tr. at 312:18-25; Agreement § 1.1; *Trireme*, 2021 WL 3668092, at *13-15 (dismissing Plaintiffs' reformation claim that the parties understood the December Milestone to serve as a proxy for the expiration of the tax credits).

In any event, IRUS was motivated by more than the potential tax credits to achieve COD of the Cassadaga Project by December 31, 2020. The longer that IRUS took to place a project into service, the longer it would forego revenue to recoup its investment. Establishing an on-shore wind energy presence in the United States was also a strategic goal for Innogy. *See* Young Dep. at 36:19-37:25; Tr. at 678:12-679:7. The Cassadaga Project was to be one of Innogy's first wind farms in the United States, and much of the company's earnings and growth goals hinged on completing projects like Cassadaga in 2020. *See* PX 17 ("Falkenhof Dep.") at 51:14-52:7; Tr. at 678:12-679:7. In its annual report, Innogy represented to its shareholders publicly that it intended to achieve a "generation capacity of around 500 [megawatts]" in the United States by 2020. DX 33 at 45; *see* Tr. 678:23-679:7, 692:8-19. IRUS's bid for Plaintiffs' portfolio of projects reflected an aggressive strategy to establish a presence in the United States's renewable-energy market by 2020; its offer of an upfront payment of $50 million exceeded the next-highest offer of guaranteed compensation, from BlackRock, by $20 million. Tr. at 297:16-19, 306:8-12.

**V.    Pre-Closing Transition of the Cassadaga Project**

Although the parties executed the Merger Agreement on December 21, 2017, the deal did not close – that is, IRUS did not take over management of development and construction of the Cassadaga Project – until July 26, 2018. Tr. at 186:23-187:1. This gap was largely due

to the need for regulatory approval before IRUS could legally acquire Cassadaga Wind LLC: first, from the Committee on Foreign Investment in the United States, and second, from the New York Public Service Commission.  *Id.* at 706:11-707:13.

At the outset, the parties initially expected that the Cassadaga Project would reach COD in September 2019, well before the December 31, 2020 date included in the Merger Agreement.  PX 72 at 5.  However, on March 1, 2018, after the Merger Agreement was executed, the New York Independent System Operator ("NYISO") issued its 2017 Class Year Facilities Study for the project, in which National Grid – the power grid operator – determined when IRUS could connect the project to the grid and how much that connection would cost. Tr. at 717:8-13; *see* DX 272.  Its study indicated that National Grid would not permit the Cassadaga Project to connect into the grid until, at the earliest, October 2020.  DX 272 at 25-26.  National Grid also listed December 2020 as the anticipated start of the project's commercial operations.  *See id.*  This update forced the parties to revise their original expectations of a 2019 COD for the Cassadaga Project.  Tr. at 720:23-721:2; *see* DX 38. Whereas the parties previously had a "time buffer" of 15 months to build the Cassadaga Project before the end of 2020, NYISO's new Facility Study shortened that window to three months.  PX 72 at 5, 17.  Having learned from National Grid's study that building the Cassadaga Project would take longer and could cost much more than expected, IRUS in April 2018 began to engage in financial modeling to explore the different scenarios available for the project.  *See id.* at 14; DX 272 at 23, 26; Tr. at 717:24-721:2, 722:4-723:7.

IRUS nevertheless prepared to work with Plaintiffs to ensure that the project would be on track for a COD before December 31, 2020, when it assumed operational control in July 2018.  As IRUS's then-CEO testified:

> In the bridging period, [IRUS] definitely tried to advance the
> development projects, including Cassadaga, as much as it could
> in collaboration with the EverPower staff. . . . [W]e really
> wanted to see the project succeed and advance as quickly as
> possible so that it could be commissioned and constructed as
> planned, and . . . we assigned significant resources to support
> that effort and help drive it forward and make key decisions and
> continue its development.

Young Dep. at 117:7-20.

However, between the Merger Agreement's execution and its closing, Plaintiffs took several steps that frustrated IRUS's efforts to further the project's timely development. First, Plaintiffs restricted IRUS's communications with Trireme employees. In an email sent on April 23, 2018, Brinklow of Terra Firma directed IRUS to communicate with Plaintiffs through only a single Trireme employee. PX 65 at 5. Centralizing communications in this way "really put a wrench in the gear box of being able to advance the development of projects, especially . . . Cassadaga." Young Dep. at 123:19-22. Brinklow also forbade IRUS from "shar[ing] project data with third parties," including contractors that IRUS planned to hire to construct the Cassadaga Project. PX 65 at 5. This measure "slowed things down" because "[t]here just wasn't the ability to finalize key aspects of the project design collaboratively with turbine selection, site arrangement, and launch key permits that typically take a long time to secure before you can actually start physical work on the project site." Young Dep. at 122:15-23. Brinklow ordered these steps because he began to doubt that the Merger Agreement would close and did not want to share information if it was not going to close. Tr. at 282:17-25. In response, IRUS explained that these restrictions would not "serve to our common goal in advancing the progress of the projects" but reluctantly agreed to follow them. PX 65 at 4.

Second, Plaintiffs had not yet applied for a wetlands permit from the U.S. Army Corps of Engineers by the time that IRUS took over the Cassadaga Project on July 26, 2018.  *See* Young Dep. at 148:1-14.  Approval of such an application usually takes about a year.  *Id.* at 148:23-149:13.  The wetlands permit "was an essential permit."  *Id.* at 147:14-15.  Critical parts of the project, such as the switchyard by which the project would deliver electricity to the New York State power grid, were located on a wetland.  PX 19 ("Puterbaugh Dep.") at 50:10-16.  While most of the Cassadaga Project site was not itself a wetland, construction crews could not access the non-wetland portions of the site without crossing wetlands via access roads.  Tr. at 754:15-24; PX 26 ("Walton Dep.") at 17:19-18:9.  Therefore, without the wetlands permit, IRUS could not use those access roads to reach most of the Cassadaga Project site.  Puterbaugh Dep. at 50:17-51:11; Walton Dep. at 263:15-19.  Until the Army Corps of Engineers approved this permit, construction could proceed only in piecemeal fashion, an approach that IRUS and its contractors confirmed was not economically feasible.  Walton Dep. at 263:15-19.

## VI.  Pre-Construction Development Efforts

### A.  Scheduling Setbacks

Based on the foregoing challenges, IRUS already faced scheduling setbacks when it ultimately closed the deal and took over the Cassadaga Project on July 26, 2018.  To help expedite the project, IRUS filed the application for the wetlands permit on August 3, 2018, within a few days of the Merger Agreement's closing.  Young Dep. at 147:16-25; DX 50 at 10.  IRUS did not receive the Army Corps of Engineers permit until December 19, 2019.  *See* PX 176 at 3.  The late permit meant that construction could not start until the winter months, which introduced more uncertainty and additional work.  In western New York, where the Cassadaga Project site is located, snow, below-freezing temperatures, and shorter

13

daylight hours slowed the pace of construction work.  Puterbaugh Dep. at 60:22-61:20; Walton Dep. at 19:10-11.

Other issues beyond IRUS's control further delayed the development – and, eventually, the construction – of the Cassadaga Project.  Within two months of IRUS taking over the Cassadaga Project, five IRUS employees, who had previously worked for Plaintiffs on the project's development, resigned.  Young Dep. at 153:2-9.  Among that group were two key employees who were responsible for the project's development under Plaintiffs.  Tr. at 195:10-17.  This "mass departure" of employees with deep institutional knowledge of the project "made it a lot more challenging" to keep the project's development on schedule because IRUS "had to pick up a lot of pieces" and "scramble quickly to hire people that would be able to pick up threads."  Young Dep. at 152:2-9.  Brinklow conceded at trial that the departure of these employees was a "negative event . . . in connection with the development of the Cassadaga Project."  Tr. at 334:23-335:2.

Plaintiffs had also failed to secure approval for the project's point of interconnection, that is, the site at which a substation would transfer power generated by the Cassadaga Project to the larger power grid (the "POI location").  In November 2017, prior to executing the Merger Agreement, Plaintiffs learned that National Grid had disapproved of their proposed POI location.  DX 15.  Plaintiffs began considering alternate locations, *id.*, but ultimately disputed National Grid's decision and tried to convince the operator to permit the original location, Tr. at 190:6-20.  In November 2018, after IRUS took over the project, IRUS learned that National Grid would not sign off on the location that Plaintiffs had chosen.  DX 122 at 1. To confirm a new POI location with a redesigned substation that National Grid would accept, IRUS needed to amend – and seek approval of – the state permit required for the project's construction (the "Article 10 permit").  Young Dep. at 161:16-22; *see* PX 105A.

**B.  Innogy Makes "Final Investment Decision" on the Cassadaga Project**

On May 21, 2019, as development on the Cassadaga Project concluded, IRUS presented the project to the board of its parent company, Innogy SE, for a "Final Investment Decision," or "FID," on whether Innogy would commit the capital necessary to see the project through construction to completion.  Tr. at 752:9-20; PX 130.  At this meeting, the board considered whether to invest in the project now, delay its investment, sell the project, or abandon it entirely.  PX 130 at 15.

In its presentation to the board, IRUS suggested that investing in the project now, to enable a 2020 COD, remained the "most attractive option[]."  *Id.*  IRUS added that, with a 2020 COD, the Cassadaga Project would "be a main contributor to our overall onshore target to install 350-500 [megawatts] of wind energy capacity in the US by the end of 2020."  DX 82 at 2.

However, IRUS qualified its recommendation with some uncertainty that the Cassadaga Project would reach a 2020 COD.  Although IRUS expected to begin construction in the third quarter of 2019 and achieve COD in the fourth quarter of 2020, it also identified "schedule delays" in obtaining an amended Article 10 permit and the wetlands permit.  *Id.* at 4.  IRUS explained that "[i]f both permits are not obtained, achieving a 2020 COD is unlikely."  *Id.*  IRUS also "stressed that a timely COD appear[ed] to be very uncertain given the numerous risks (e.g. permit, construction phase) and the tight timetable."  PX 126A at 1.

Notwithstanding the risks, the Innogy board ultimately accepted IRUS's recommendation and approved a Final Investment Decision for the Cassadaga Project with a target date of COD by Q4 2020.  Tr. at 757:17-22; DX 82 at 4.

### C.  Trireme Also Notes Uncertainty for a 2020 COD

On July 29, 2019, IRUS informed Trireme that it had "decided internally to keep advancing the project," and that, "[i]n furtherance of that approach, [it had] made the necessary commitments and major payments . . . to support a 2020 COD."  PX 142 at 1. IRUS stressed, however, there were "still several hurdles and some outstanding permits and development items to secure to assure we can achieve the 2020 COD."  *Id.*  In the same email, IRUS communicated that it had decided to delay the COD for another project to 2021 due in part to similar permitting challenges.  *Id.*

Plaintiffs absorbed this information, noting internally the uncertainty of achieving COD in 2020.  For example, in December 2019 – shortly before IRUS received a wetlands permit from the Army Corps of Engineers – Terra Firma's internal estimates projected only a 60% chance that Cassadaga would achieve COD in 2020.  *See* DX 125 at 3; Tr. at 339:18-340:22.

## VII.    Initial Construction of the Cassadaga Wind Farm

On December 19, 2019, IRUS obtained the wetlands permit for the Cassadaga Project from the Army Corps of Engineers – a "huge milestone" that allowed the project to proceed with construction.  PX 176 at 3.  With the permit in hand, IRUS immediately scheduled its contractors to begin construction the next week, between Christmas and New Year's Eve – a week during which construction contractors usually do not work due to the holidays and the cold weather.  Puterbaugh Dep. at 51:18-52:3; Walton Dep. at 20:17-24.  IRUS hired several contractors to help construct the Cassadaga Project.  Tr. at 1023:3-6; *see* Walton Dep. at 13:19-25.  Among the most significant of those contractors were: (1) The O'Connell Electric Company ("O'Connell Electric"), which IRUS hired to build the POI substation that would deliver electricity to the power grid, Puterbaugh Dep. at 39:15-24; 60:10-13; (2) JBS

Energy Solutions ("JBS"), hired as the civil works contractor to prepare the project site, build

access roads to the site, and pour the concrete foundations for the wind turbines, *id.*

at 74:23-75:3; (3) Global Wind Services, hired to erect and install the wind turbines, Tr.

at 1113:7-11; and (4) Siemens Gamesa Renewable Energy S.A. ("Siemens Gamesa") and

Nordex SE, hired to supply the actual wind turbines, Puterbaugh Dep. at 128:2-6.

Given the pre-construction delays – including the delay in obtaining the wetlands

permit – which prevented IRUS from starting construction until late December 2019,

O'Connell presented IRUS with a mitigation plan in late January 2020 to accelerate its work.

*Id.* at 63:8-13; PX 188.  Because construction had started in late December 2019 instead of, as

anticipated, October 2019, IRUS did not think that it could place the Cassadaga Project in

service by the end of 2020 without this mitigation plan.  Puterbaugh Dep. at 62:10-18.  As

part of that plan, O'Connell requested, and IRUS approved, a change order that included

working overtime and additional shifts through the winter months.  *See id.* at 313:12-315:15;

PX 188.  IRUS paid O'Connell an additional $534,594 under that change order.  *See* PX 188

at 2; PX 196; Walton Dep. at 19:4-15.

## VIII.   COVID-19 Pauses Construction

### A.   New York's Initial Shutdown

Then the COVID-19 pandemic hit. On March 22, 2020, the State of New York

directed all non-essential businesses to shut down in-person functions due to the COVID-19

pandemic.  *See* PX 25 ("Sundstrom Dep.") at 57:8-58:20.  Initially, IRUS understood the

state's order to allow utility-related construction and continued work on the project.  Walton

Dep. at 21:7-18, 24:8-20, 25:12-21; PX 256A at 4.  In the beginning of April 2020, however,

IRUS learned that the Cassadaga Project was not exempt from New York's shutdown.

Walton Dep. at 26:6-24.  Therefore, work was paused on the Cassadaga construction site on

April 7, 2020. *Id.* at 26:2-17; PX 237; Puterbaugh Dep. at 73:8-16, 211:4-23. IRUS quickly petitioned state regulators to continue construction on the project. *See* Sundstrom Dep. at 28:15-29:2. IRUS also hired a law firm, which applied for and received a partial exemption from the state's construction restrictions to continue work on the POI switchyard and meteorological towers as essential work. DX 142 at 3; PX 243; Puterbaugh Dep. at 70:8-71:18, 85:2-23. Of the project's 165 workers, only 20 were allowed to continue the project's "high-voltage" work, including on the POI substation. Walton Dep. at 22:7-13; *see id.* at 27:10-17; PX 237; PX237A. The other 145 workers were barred from the project site for the duration of New York's shutdown, which lasted from April 7 to May 19, 2020. *See* Tr. at 577:14-21; Walton Dep. at 30:6-10; Puterbaugh Dep. at 69:14-70:3.

On May 19, 2020, the same day that IRUS received notice that western New York was reopening from the COVID-19 shutdown, Jeffrey Puterbaugh, IRUS's senior director of construction, wrote to O'Connell Electric that construction could resume on the Cassadaga Project. DX 153. However, workers were not able to remobilize to the Cassadaga Project in earnest until June 8, 2020. *See* Tr. at 580:22-25. For a project as large and complex as Cassadaga, remobilization required more than switching on the lights. Walton Dep. at 22:20-23:9. Not knowing how long the shutdown would last, IRUS's contractors had moved their equipment off the site. *Id.* at 23:1-9. To bring that equipment back, the contractors needed new permits. *Id.* Another contractor informed IRUS that "[i]nefficiencies due to COVID-19 impacts and State ordered additional safety measures" had further delayed its remobilization by two weeks. *See* PX 292A at 2. IRUS expected remobilization to take between one and two weeks. Walton Dep. at 23:8-9; *see* PX 492A at 2. Ultimately, workers did not fully remobilize to the project site until about eight weeks after the shutdown on April 7, 2020. *See* Walton Dep. at 232:8-21.

**B.  COVID-19 Challenges Persist**

Even after New York lifted its shutdown order, COVID-19 introduced additional delays into IRUS's construction schedule.  New York imposed travel restrictions, contact tracing, and quarantine requirements, which adversely impacted the Cassadaga Project.  Tr. at 896:14-897:10, 897:18-898:10.  In particular, at least three workers at the Cassadaga site tested positive for COVID-19 during construction.  Each positive test required contact tracing and further testing on the site before work could resume, creating additional days of delay each time.  PX 444; *see* Puterbaugh Dep. at 116:10-17.

Several contractors also imposed restrictive protocols in response to COVID-19, limiting IRUS's ability to accelerate its construction timeline.  O'Connell Electric required a two-week quarantine for any employee exposed to someone with COVID-19.  DX 141 at 8. For employees with COVID-19 symptoms and employees in contact with confirmed or suspected COVID-19 cases, Siemens Gamesa issued a 15-day ban from its premises.  *Id.* at 53-54.  One subcontractor, Signal Energy Constructors, restricted "[a]nyone who uses mass transit travel" from working in its office or on site for two weeks, applying its policy even for employees with no symptoms and no contact with anyone diagnosed with COVID-19.  *Id.* at 10.  Another subcontractor, Capital City Renewables, required its crew members to be picked up by car and driven to sites.  *Id.* at 9.  These COVID-19 protocols further slowed the Cassadaga Project's progress by restricting access to the construction site and imposing additional requirements.

**C.  COVID-19 Forces Parties to Manage Expectations for a 2020 COD**

The onset of the pandemic prompted the parties to revisit once again their expectations for the Cassadaga Project's COD.  In IRUS's view, while a 2020 COD was becoming less likely, it was still possible and remained the goal.  *See* Walton Dep. at 143:13-20, 228:3-10.

In April 2020, IRUS sent Innogy a "Cassadaga Covid-19 Work Suspension Risk Assessment" with various scenario plans, PX 260, including one that that predicted that if work resumed around mid-June – as ultimately happened – the "[o]riginal schedule [would be] impossible," PX 260A.  That risk assessment allowed a "very small chance [that] acceleration plans could recover for 2020 COD."  *Id.*  But IRUS's goal was still to press for a COD in 2020.  *See* Walton Dep. at 24:14-18.  Amid "a lot of uncertainty, . . . the belief [was] that the project could still be COD'd in 2020."  *Id.* at 32:13-24.

Plaintiffs also understood that the COVID-19 pandemic would delay completion of the project.  An IRUS employee informed Plaintiffs on April 2, 2020, that the project was "on track for a Q4 2020 COD" but cautioned that "the rapidly evolving COVID-19 situation in New York may result in a temporary shutdown of our construction activities at Cassadaga.  This is a dynamic situation."  PX 234 at 1.  Terra Firma employees were pessimistic in early April 2020 about the project's likelihood of reaching a 2020 COD.  In an email sent on April 9, 2020, Brinklow estimated that COVID-19 had reduced the likelihood of a 2020 COD and a corresponding Milestone Payment to 30%.  *See* DX 144 at 1.  An internal Terra Firma presentation from mid-April 2020 – citing 195,000 COVID-19 cases in New York as of April 14, 2020, social-distancing measures, and working restrictions – similarly lowered the project's probability of achieving the December Milestone from 60% to 30%.  *Compare* DX 125 at 3, *with* PX 247 at 5; *see* PX 247 at 6.  Shortly thereafter, an updated version of the same presentation – noting over 250,000 COVID-19 cases in New York, "the worst affected area of the United States," as of April 20, 2020 – lowered this probability to 0%, adding that "[i]t is not clear that construction work on the project could continue in the same manner and at the same pace given social distancing measures and working restrictions."  DX 259 at 3; Tr. at 349:5-350:5.

20

**IX.     IRS Extends the Safe-Harbor Deadline**

Because the COVID-19 pandemic disrupted construction across the country, the American Wind Energy Association ("AWEA"), a wind-power trade group of which IRUS was a dues-paying member, lobbied Congress on behalf of the industry to extend the safe-harbor deadline for wind-energy projects to obtain the full value of renewable-energy tax credits. *See* Sundstrom Dep. at 20:25-21:15, 161:6-17, 171:24-172:18. As an industry trade group, AWEA represented most, if not all, major wind-power companies in the United States in their dealings with federal and state governments. *Id.* at 18:9-19:5.

In May 2020, the IRS announced that it would extend the safe harbor for renewable-energy projects that began construction in 2016 and 2017. DX 158. Noting that "COVID-19 has caused industry-wide delays in the supply chain for components needed to complete renewable energy projects otherwise eligible for important tax credits," the IRS added an extra year by which these projects could be placed in service for their construction to be deemed continuous. *Id.* Under the new guidance, IRUS could therefore obtain the full value of the relevant tax credits for the Cassadaga Project if it achieved commercial operation before December 31, 2021.

IRUS employees welcomed the safe-harbor extension announcement. On May 7, 2020, IRUS's director of governmental and regulatory affairs Craig Sundstrom emailed several IRUS executives, including then-CEO Frank Falkenhof, that "US Treasury just announced . . . that the[] agency will be issuing rules to extend the wind PTC and ITC safe harbor by one year. . . . [T]his is a huge development for us and in line with our recent advocacy." PX 274 at 1. In another email sent that day to IRUS's regulatory lawyers, Sundstrom called the announcement "very good news for Cassadaga." PX 275 at 1. The safe-harbor extension became official on May 28, 2020. *See* I.R.S. Notice 2020-41, 2020-25

I.R.B. 954.  IRUS finance director Juan Rodriguez forwarded a copy of the official IRS notice to several colleagues, commenting: "I am happy to share the attached IRS / Treasury notice with you.  It is the anticipated guidance we were eagerly seeking to provide relief due to Covid-19 delays."  PX 284 at 1.

While the correspondence in the record reflects relief over the extended availability of a valuable tax credit, there is no evidence that IRUS thereafter paused, delayed, or stopped working on the Cassadaga Project or even that they ever discussed doing so because the safe harbor had been extended.  Jade Walton – IRUS's and RWE's project manager for Cassadaga – testified that, after the safe-harbor extension, "[t]he message from my boss and my boss's boss was to always – to bring in the project in 2020, and that was the goal, and that was the objective."  Walton Dep. at 36:17-21; *see also id.* at 262:12-15.  Puterbaugh, who oversaw IRUS's construction projects, similarly denied that there were any "instructions or direction from management to slow down the work on Cassadaga," stating that, "on the contrary, we were being pushed very hard to accelerate the work if we could and get it done as quickly as possible."  Puterbaugh Dep. at 156:6-21.  Other members of IRUS's management team, including Falkenhof and Rodriguez, also credibly denied that there was any attempt by IRUS to purposely delay the Cassadaga Project's construction to 2021 or to deprive Trireme of its Milestone Payment.  *See, e.g.*, Sundstrom Dep. at 67:23-68:16; Falkenhof Dep. at 148:3-10; Tr. at 773:12-774:10 (Rodriguez).  On the contrary, those at IRUS involved in managing and supervising the Cassadaga Project pressed on with their goal of completing the project in 2020.  *See, e.g.*, Walton Dep. at 238:19-239:15.  The Court finds this testimony credible and consistent with IRUS's continued actions to complete construction before December 31, 2020, even after the safe-harbor extension was granted.

### X.   Post-Extension Construction Efforts

#### A.  IRUS Keeps Projected COD of 2020

Even after the IRS's safe-harbor extension, IRUS still believed that it was possible to operationalize the Cassadaga Project in 2020 and continued to push to complete the project within that time.  *See id.* at 32:13-24.  On the same day that New York ended its shutdown, May 19, 2020, and announced a "Phase I Reopening" in the county where Cassadaga was located, IRUS notified O'Connell Electric that construction could and should resume immediately.  *Id.* at 29:3-19; DX 153.

IRUS also pushed its contractors to accelerate their work schedules.  In June 2020, when JBS, who was hired to build access roads and pour concrete foundations for the project's 37 turbines, requested a 12-week extension to its original construction schedule because of the COVID-19 shutdown, IRUS rejected the request.  *See* PX 308 at 3-6.  As IRUS explained to JBS, it did not understand how "a 43 day work suspension" due to the COVID-19 shutdown "translates into a 84 day schedule extension."  *Id.* at 3.  JBS responded with a new proposed schedule dated July 16, 2020, which cut down JBS's scheduled delay by approximately four weeks.  PX 417; PX 417A; Puterbaugh Dep. at 111:6-20.  For IRUS, JBS's original proposal for a 12-week delay would have placed a 2020 COD out of reach.  *See* Tr. at 964:15-23.  By contrast, the four weeks saved in JBS's revised schedule preserved the possibility, albeit slim, that the Cassadaga Project would reach a COD within 2020.  *See id.* at 964:24-965:16; Puterbaugh Dep. at 113:1-4.

#### B.  RWE Acquires IRUS; Keeps 2020 COD for Cassadaga

RWE's acquisition of IRUS's parent company closed on July 1, 2020.  *See* Tr. at 671:22-672:2.  Upon consummation of the merger and after RWE assumed control over IRUS's operations, IRUS reassigned some of the staff working on the Cassadaga Project.  For

example, Puterbaugh now reported to John Badeusz, RWE's North American Head of Wind Construction, who assumed responsibility for the project.  Tr. at 858:23-859:5, 862:11-14.

As of July 2020, IRUS (now RWE) still believed that the window for achieving a 2020 COD for the Cassadaga Project was tight but achievable.  *See* Puterbaugh Dep. at 114:5-8.  In an email dated July 8, 2020, Walton acknowledged that "risk does exist of a 2021 COD," but added that, "given the current progress on site, I do believe a pass to 2020 COD is still attainable."  Walton Dep. at 33:14-21.  Badeusz, who had recently assumed responsibilities for IRUS's projects, similarly acknowledged that same day that a "Q4 2020 COD remains the forecast."  PX 561 at 1. In a later email dated July 28, 2020, Badeusz disagreed with the suggestion that "COD may have slipped into Q1 2021" and said that the "current view" was for a COD of December 30, 2020.  PX 330 at 1-2.  There were still risks, however.  On August 11, 2020, when Badeusz provided his construction update to RWE's CEO, he listed the date for all wind turbines generating for the Cassadaga Project as "December 31, 2020?", with the question mark indicating that he was beginning to receive information that the December 31, 2020 COD may not be achievable.  PX 334.  On August 13, 2020, Badeusz reported more specifically to RWE's CEO and the head of Human Resources that the project was "[n]ot on-schedule" and noted its COD as "December 2020? – February 2021?"  PX 338 at 1 (emphasis omitted).[4]

Despite acknowledging that Cassadaga's 2020 COD was at risk, IRUS continued to maintain a 2020 COD as its goal and pressed toward that goal.  Having spent hundreds of

---

[4] While Plaintiff points to Badeusz's testimony that many of the construction issues listed in his email as to the Cassadaga Project did not significantly delay its COD, Tr. at 1116:17-23, 1117:22-1118:8, 1120:25-1121:13, 1125:13-1126:2, the email nonetheless indicates several issues that IRUS would need to manage appropriately for a project that was already further from completion and had more complications than other projects, and for which an untimely resignation was problematic, *see infra* Findings of Fact § X(D).

millions of dollars on the project's construction, IRUS (and, by extension, RWE) wanted to begin commercial operations and start generating a return on its investment as soon as possible. Tr. at 865:1-9. A 2020 COD also remained significant for IRUS's growth goals; having planned to grow its renewable-energy operations by a certain level of megawatts in 2020 – and having relayed those goals to investors – IRUS had a strong reason to meet those expectations. *Id.* at 865:10-14. IRUS further recognized that pushing the project's COD to 2021 would significantly increase costs: IRUS would need to pay its contractors more money for their time and dedicate internal resources to the project for longer than it had expected. Puterbaugh Dep. at 120:23-121:22. IRUS would also risk further weather-related delays as construction continued into the winter months of late 2020 and early 2021. *Id.* In particular, the work involved at the end of the project's construction – erection of the wind turbines – is more prone to delays during the winter months due to high winds, snow, and ice. *Id.*; Walton Dep. at 34:13-18; Tr. at 603:21-25.

### C.  JBS Falls Behind Schedule

Subsequent developments in the summer of 2020 further complicated IRUS's goal of a 2020 COD. JBS, who had already agreed with IRUS to push back its construction schedule by eight weeks, made slower progress on its work than expected. *See* Puterbaugh Dep. at 130:6-14. For example, although IRUS expected JBS to pour the first of 37 concrete foundations for the project's turbines on July 30, 2020, JBS did not do so until August 18, 2020. *See* PX 330 at 1; PX 391 at 1. The causes of these delays were often beyond JBS's – or IRUS's – control. *See* DX 191 at 2. Sometimes poor weather forced JBS to miss its deadlines. *See* Puterbaugh Dep. at 130:9. At one point in August 2020, the local crane operators' union "ran [JBS's] . . . crane operator off of the project unexpectedly," which "caused a delay." PX 392 at 1. In other cases, COVID-19 caused the delay. Puterbaugh Dep.

at 130:10.  On August 6, 2020, for example, IRUS understood that JBS had suffered another

delay due to a COVID-19 outbreak among its employees, several of whom would need to

quarantine.  DX 282; DX 283.

Despite these challenges, IRUS pushed JBS to stick to its revised schedule.  *See*

Puterbaugh Dep. at 113:5-114:8.  Shortly after JBS poured its first foundation, Jade Walton

noted JBS's lack of progress and told JBS that he had recommended that IRUS not pay JBS

until it offered a plan to get back on track.  PX 392 at 3.  JBS responded that it was pursuing

several acceleration measures to speed up its schedule.  *Id.* at 1.  JBS said that it had acquired

a third crane and mobilized additional work crews.  *Id.*  JBS also said that it was exploring

"polylithic concrete placements," by which its concrete supplier would pour the concrete for

each turbine foundation in two stages, rather than in one continuous pour.  *Id.*  JBS explained

that this change would allow its concrete provider to use its out-of-town drivers to pour

foundations at a faster rate.  *Id.*

As IRUS pressed JBS to meet its revised schedule, however, it also discovered issues

with the quality of JBS's work.  On August 25, 2020, IRUS noted a large crack – leaving a

hole or void about two feet deep – in the first foundation that JBS had poured.  DX 191 at 4-5.

As IRUS noted at the time, the crack presented "a big quality problem."  *Id.* at 1.  Left

unaddressed, such a crack, especially in the base of the foundation, could lead to problems as

serious as a wind turbine – weighing hundreds of thousands of pounds – becoming unmoored

from its foundation and falling over.  Tr. at 937:12-23.  This crack further delayed the

Cassadaga Project's construction schedule in two ways.  First, JBS needed to tear down the

foundation completely and pour a new one in its place.  *Id.* at 937:5-7, 938:7-11.  Second, JBS

needed to pause its work until it identified what went wrong with the first foundation.  *Id.*

at 938:3-6.  Without understanding why a crack in the first foundation had appeared – whether

due to poor construction methods or issues with the quality of the concrete used – JBS risked causing future delays or quality issues when it poured the project's remaining 36 foundations. *Id.* at 933:19-934:6, 936:25-937:2.  Demonstrating further that JBS fell behind its revised schedule, IRUS collected liquidated damages from JBS.  *Id.* at 953:23-954:3.

### D.  IRUS Suffers Untimely Resignation

During this time, Cassadaga's project manager Jade Walton announced that he would be resigning.  PX 338.  For Badeusz, this resignation "was obviously a huge blow for the project" because it hurt IRUS's "ability to manage the project effectively."  Tr. at 904:18-19, 905:3-4.  "[I]n the midst of trying to get Cassadaga fully constructed," losing the project's primary manager was "a huge disruption in [IRUS's] ability to keep the project well managed and underway."  *Id.* at 905:8-11.  Not many employees at IRUS or RWE had as much "institutional knowledge in the project" as Walton.  *Id.* at 904:25; *see id.* at 904:23-905:2. The one other employee as familiar with the project's day-to-day operation was Puterbaugh. *See id.* at 905:20-24; PX 338 at 1.  Puterbaugh, however, was not enthusiastic about replacing Walton as project manager.  PX 338 at 2.  Having served as Walton's supervisor, he "had higher aspirations than just acting as the project manager on the Cassadaga project" and viewed the new role as a demotion.  Tr. at 905:25-906:2; *see id.* at 907:4-7.  After a "[v]ery difficult conversation" with Badeusz, Puterbaugh ultimately agreed to replace Walton as Cassadaga's project manager.  PX 338 at 1; *see* Tr. at 907:13-16.

### XI.   IRUS Determines that Project Will Not Reach 2020 COD

#### A.  Revision of Projected COD to 2021

By late August 2020, the Cassadaga Project's managers discussed "officially" changing the projected COD to sometime in 2021.  PX 396 at 1; *see* Puterbaugh Dep. at 116:4-117:2.  As discussed above, several reasons rendered a 2020 COD "highly

improbable" by this time.  Puterbaugh Dep. at 116:22.  At the outset, developmental issues related to the project's POI location and the wetlands permit had pushed the project's projected COD from 2019 into late 2020.  *See* DX 272 at 25-26; PX 176.  The COVID-19 pandemic inflicted "by far the biggest impact," as it "effectively delayed" the project's "civil access road and foundation construction by eight weeks."  Puterbaugh Dep. at 137:12-14. As construction progressed in the summer of 2020, subsequent delays and quality issues (notwithstanding acceleration measures undertaken by JBS) prompted IRUS to conclude "that [a 2020 COD] wasn't going to happen."  *Id.* at 137:20-23. Notably, IRUS's Milestone Payment to Trireme was not part of these discussions about changing the project's projected COD.  *Id.* at 592:10-13.

By September 15, 2020, IRUS was "99 percent sure" that the Cassadaga Project would not reach a COD until 2021.  *Id.* at 136:12-137:6.  IRUS estimated a COD of March 5, 2021, but noted that winter weather could push that date back even further.  *Id.* at 136:21-23.  IRUS informed Plaintiffs later that month, in September 2020, of its revised projection.  PX 426; DX 194 at 2.

IRUS did not take lightly the revision of the Cassadaga Project's projected COD to 2021.  The project's managers knew that this revision would be "poorly received" at Innogy and that "there would be a lot of disappointment."  Puterbaugh Dep. at 117:23-119:5. As discussed above, Innogy (and, by extension, RWE) had approved the spending of roughly $350 million with the expectation that the project would come online and begin generating revenue by December 31, 2020.  Tr. at 942:8-22.  Changing that estimate would have "very negative implications" for IRUS's earnings and growth projections.  *Id.* at 942:21-22.  The Court finds credible Badeusz's testimony that IRUS revised the projected COD to 2021 only after confirming that it had tried everything within its power to complete the project in 2020.

*Id.* at 940:7-18.  Puterbaugh credibly testified that he was unaware of any conversation among his colleagues about avoiding the Milestone Payment to Trireme if Cassadaga's COD was moved to 2021.  Puterbaugh Dep. at 552:17-23.

### B.  RWE's Other Projects Miss Projected 2020 COD

Missing the Cassadaga Project's projected 2020 COD, while disappointing to IRUS, was not altogether surprising.  At least four other wind farms owned by RWE missed their projected 2020 COD.  Tr. at 948:3-949:12; *see* PX 334.  For each one, the effect of the COVID-19 pandemic compounded other challenges to prevent the project from reaching its target COD in 2020.  Tr. at 949:4-12.

### C.  Even Under 2021 COD, IRUS Maintains Pressure

Even after recognizing that a projected COD of 2020 for the Cassadaga Project was unrealistic, IRUS's aim was still to complete the project as soon as possible.  *Id.* at 945:6-10; Puterbaugh Dep. at 140:10-11.  As late as September 4, 2020, IRUS pushed JBS to maintain its construction schedule, even over a holiday weekend.  *See* DX 289.  IRUS noted the deficiencies and delays in JBS's performance and stated that JBS's "lack of timely progress is absolutely killing us."  *Id.* at 1.

## XII.  Completion of the Cassadaga Project

Ultimately, the Cassadaga Project reached its COD on August 26, 2021 – eight months after the December Milestone date.  DX 220.  In addition to the issues described above, the project "ran into a number of problems" in building the underground collection system, that is, the electrical wiring that connects the turbines to each other.  Tr. at 967:3-10.  Fluid used to lubricate some of the project's drills "caused an environmental issue" when it spilled into a nearby pond.  *Id.* at 967:11-16.  Workers had to "stop work, clean up the pond . . . and get

approval that th[e] environmental cleanup was adequate and complete before [they] could begin work again." *Id.* at 967:16-19.

IRUS did not pay Trireme the $69.7 million Milestone Payment for the Cassadaga Project. *Id.* at 846:1-6. With the late COD, IRUS (now RWE) incurred the costs associated with carrying its investment of approximately $350 million for an extra eight months past the projected 2020 COD with no return. *Id.* at 947:9-16.

## CONCLUSIONS OF LAW

As discussed above, Trireme brings claims against IRUS for: (1) a breach of the implied covenant of good faith and fair dealing; and (2) a breach of Section 7.6(b) of the Merger Agreement for failure to provide timely reports on the Cassadaga Project's development. Trireme also seeks a declaration that Innogy is jointly and severally liable, pursuant to a parent guarantee, for any damages awarded in this case. The Court addresses each claim in turn.

As a preliminary matter, the parties agree, and the Court concludes, that New York law governs this dispute. Generally, a federal court sitting in diversity applies the choice-of-law rules of the state in which it sits. *See Petróleos de Venez., S.A. v. MUFG Union Bank, N.A.*, 51 F.4th 456, 467 (2d Cir. 2022). Under New York choice-of-law rules for cases involving a contract with a choice-of-law clause, such as the Merger Agreement, the court "appl[ies] the law selected in the contract as long as the state selected has sufficient contacts with the transaction." *Hartford Fire Ins. Co. v. Orient Overseas Containers Lines (UK) Ltd.*, 230 F.3d 549, 556 (2d Cir. 2000). Here, because the Cassadaga Project is itself in New York, the Court finds sufficient contacts between New York and the transactions undertaken through the Merger Agreement to justify the parties' chosen application of New York law. Therefore, the Court applies New York law in interpreting the contract.

The Merger Agreement's choice-of-law clause also applies to Plaintiffs' claims. Plaintiffs' claim for a breach of Section 7.6(b) of the Merger Agreement arises, by definition, from the Merger Agreement, so New York law applies.  Plaintiffs' implied-covenant claim similarly arises from a breach of the Merger Agreement.  *See Nat'l Mkt. Share, Inc. v. Sterling Nat'l Bank*, 392 F.3d 520, 525 (2d Cir. 2004) (noting that, under New York law, a breach of the implied duty of good faith "is merely a breach of the underlying contract" (citation omitted)).  Therefore, Plaintiffs' implied-covenant claim is a "claim . . . directly or indirectly based upon or arising out of th[e] [Merger] Agreement," which is governed by New York law. Agreement § 13.5.

## I.   Implied Covenant of Good Faith and Fair Dealing

Trireme admits that nothing in the Merger Agreement expressly states that IRUS was required to complete the construction of any project, to accelerate or expedite the construction of a project, or to spend any amount of money on a project's construction.  Tr. at 322:15-25. Instead, Plaintiff claims that IRUS breached the implied covenant of good faith and fair dealing by failing to reach COD by December 31, 2020, in order to deprive Plaintiff of the $69.7 million Milestone Payment.  SAC ¶¶ 116-129.

### A.   Applicable Law

"Under New York law, a covenant of good faith and fair dealing is implicit in all contracts."  *Tractebel Energy Mktg., Inc. v. AEP Power Mktg., Inc.*, 487 F.3d 89, 98 (2d Cir. 2007); *accord Singh v. City of New York*, 217 N.E.3d 1, 5 (N.Y. 2023).  Included in this covenant is a pledge that "neither party shall do anything that has the effect of destroying or injuring the right of the other party to receive the fruits of the contract, or to violate the party's presumed intentions or reasonable expectations."  *Spinelli v. Nat'l Football League*, 903 F.3d 185, 205 (2d Cir. 2018) (alterations adopted and quotation marks and citation omitted).

31

"Where the contract contemplates the exercise of discretion, [the duty of good faith and fair dealing] includes a promise not to act arbitrarily or irrationally in exercising that discretion." *Cordero v. Transamerica Annuity Serv. Corp.*, 211 N.E.3d 663, 670 (N.Y. 2023) (citation omitted).

This covenant, however, "does not include any term inconsistent with the terms of the contractual relationship, or create duties which are not fairly inferable from the express terms of that contract." *Kitchen Winners NY Inc. v. Rock Fintek LLC*, --- F. Supp. 3d ----, 2023 WL 2746031, at *14 (S.D.N.Y. Mar. 31, 2023) (citation omitted); *accord Singh*, 217 N.E.3d at 5-6; *see Compania Embotelladora Del Pacifico, S.A. v. Pepsi Cola Co.*, 976 F.3d 239, 248 (2d Cir. 2020) (noting that "the covenant of good faith and fair dealing does not give rise to new, affirmative duties on contracting parties"). "Nor can it be construed so broadly as effectively to nullify other express terms of a contract, or to create independent contractual rights." *Kitchen Winners*, 2023 WL 2746031, at *14 (quotation marks and citation omitted). And most importantly, the implied covenant does not "undermine a party's general right to act on its own interests in a way that may incidentally lessen the other party's expected benefit." *Sec. Plans, Inc. v. CUNA Mut. Ins. Soc'y*, 769 F.3d 807, 817 (2d Cir. 2014) (quotation marks and citation omitted).

Establishing a breach of the implied covenant further requires the plaintiff to "show substantially more than evidence that the defendant's actions were negligent or inept." *Id.*; *see Tractebel Energy Mktg., Inc.*, 487 F.3d at 98 (recognizing a "presumption that all parties act in good faith" (citation omitted)). "The plaintiff must instead demonstrate something more, such as that the defendant 'acted arbitrarily or irrationally in exercising the discretion' afforded to it under the contract." *Sec. Plans, Inc.*, 769 F.3d at 818 (alterations adopted) (quoting *Dalton v. Educ. Testing Serv.*, 663 N.E.2d 289, 291 (N.Y. 1995)). "[I]ntentional acts

32

done without the purpose of cheating the plaintiff" are insufficient to establish a breach of the implied covenant. *Thompson v. Advanced Armament Corp.*, 614 F. App'x 523, 525 (2d Cir. 2015) (summary order). "[O]nly in a narrow range of cases" will the Court find such a breach, *Sec. Plans, Inc.*, 769 F.3d at 817, such as when a party "exercises its discretion malevolently, for its own gain as part of a purposeful scheme designed to deprive its counterparty of the benefits of a contract," *Najjar Grp., LLC v. W. 56th Hotel LLC*, 850 F. App'x 69, 72 (2d Cir. 2021) (summary order) (alteration adopted and quotation marks and citation omitted). "Conduct which reaches the level of reckless disregard may be sufficient to evidence a breach of the implied covenant of good faith, but only if it is severe enough to warrant an inference that the party acted in bad faith, or intended to do harm." *Lykins v. IMPCO Techs., Inc.*, No. 15-cv-02102 (PGG), 2018 WL 3231542, at *8 (S.D.N.Y. Mar. 6, 2018) (citation omitted).

"While courts generally find that a defendant violates the covenant of good faith and fair dealing only when he acts with some improper motive, a plaintiff need not present direct evidence of an improper motive." *Dreni v. PrinterOn Am. Corp.*, 486 F. Supp. 3d 712, 731 (S.D.N.Y. 2020) (quotation marks and citation omitted). "Rather, bad faith can be inferred from evidence that the defendant's conduct was arbitrary or contrary to reasonable expectations." *Id.*; *see Cont'l Ins. Co. v. NLRB*, 495 F.2d 44, 48 (2d Cir. 1974) (explaining that, because "it would be extraordinary for a party directly to admit a 'bad faith' intention, [a party's] motive must of necessity be ascertained from circumstantial evidence . . . the determination of intent must be founded upon the party's overall conduct and on the totality of the circumstances, as distinguished from the individual pieces forming part of the mosaic").

**B.  Analysis**

There is no direct evidence that IRUS delayed, stopped, or paused construction of the Cassadaga Project to deprive Plaintiffs of the Milestone Payment.  The Court finds credible the consistent testimony of IRUS's current and former employees who testified that they did not act – nor even discuss acting – in this manner.

Recognizing that bad faith can be inferred from the conduct of a party, even without direct evidence, the Court finds that IRUS's conduct does not support an inference that IRUS acted in bad faith to delay the construction of the Cassadaga Project to deprive Plaintiff of the Milestone Payment.  *See Dreni*, 486 F. Supp. 3d at 731.  On the contrary, the IRUS employees most responsible for the Cassadaga Project's development and construction testified credibly and consistently that IRUS undertook significant efforts to complete the Cassadaga Project by the end of 2020.  Within a week of assuming control over the project, IRUS applied to the Army Corps of Engineers in August 2018 for a wetlands permit.  Once it finally received that permit in December 2019, nearly seventeen months later, IRUS immediately began construction, even paying one contractor over $500,000 to accelerate its work.  Although COVID-19 shut down construction for another two months, IRUS secured an exemption to continue working on part of the project.

Even after the safe-harbor extension, IRUS continued to target, and worked diligently towards, the Cassadaga Project's commercial operation by the end of 2020.  On the same day that New York lifted its COVID-19 shutdown, IRUS asked its contractors to remobilize.  DX 153.  IRUS even denied one contractor's request for more time to remobilize and negotiated a shorter timetable for remobilization.  PX 417 at 2; Puterbaugh Dep. at 111:6-20.  As that contractor fell behind schedule, IRUS threatened to withhold payment unless it implemented acceleration measures.  PX 392 at 3.  IRUS, however, was made aware of issues

with the quality of the contractor's work, including a large crack in the foundation of one of the wind turbines.  DX 191 at 4-5.  And when Cassadaga's project manager resigned unexpectedly, IRUS replaced him quickly with the person remaining with the most relevant knowledge of the project.  PX 338; Tr. at 907:13-16.  Ultimately, the project's slow progress prompted IRUS in September 2020 to push its projected COD to 2021.  Even then, however, IRUS continued to try to complete the project as soon as possible.

Steps taken after the safe-harbor extension – including the rapid notification that contractors could resume construction; the pressure on JBS to provide a shorter replacement schedule; the request for JBS to implement acceleration measures; and the prompt substitution of an unwilling Puterbaugh for Walton as project manager – are all inconsistent with an intent or goal to delay or slow construction of the Cassadaga Project to deprive Plaintiffs of the Milestone Payment.  Had IRUS endeavored to push the project's COD into 2021, it could have relied on any one of these opportunities as an excuse to do so.  It could have, for example, accepted JBS's proposed schedule that delayed the project by 12 weeks, or taken more time to replace Walton at the project's helm.  The company's efforts to press for a 2020 COD despite these challenges refute the suggestion that IRUS acted with bad faith.  The testimony given at trial and in prior depositions admitted at trial confirms that the project's eventual completion in 2021 was due to an already tight schedule further complicated by the COVID-19 pandemic and contractor issues, not a deliberate choice to avoid the Milestone Payment and deprive Plaintiffs of the "fruits of the contract."  *Spinelli*, 903 F.3d at 205 (citation omitted).

Plaintiffs have not identified any evidence from the record that anyone on the Cassadaga Project acted in bad faith.  Plaintiffs' corporate representative testified that Plaintiffs' allegations are not based on direct "firsthand knowledge" of bad faith, but rather on

an inference drawn from the circumstances of the Cassadaga Project's completion.  Tr. at 359:14-360:12.  But nothing in the testimony presented or the voluminous documents admitted proves that IRUS purposely slowed or stopped construction for the purpose of depriving Plaintiffs of the Milestone Payment.  Instead, the evidence confirms that IRUS continued targeting a 2020 COD and its decision to push commercial operation of the Cassadaga Project to after December 31, 2020 was not done "malevolently, for its own gain" but rather was a reluctant conclusion reached after a series of delays beyond its control.  *Najjar Grp., LLC*, 850 F. App'x at 72 (citation omitted).

Having previously offered several theories of Defendants' breach of the implied covenant, Plaintiffs ultimately argued, after the evidence was presented at trial, that IRUS acted in bad faith to delay construction by abusing its discretion under the Merger Agreement by making an irrational, arbitrary, and otherwise uninformed decision in September 2020 to change Cassadaga's projected COD to 2021.  *Compare* ECF No. 224 at 47-58 (arguing that IRUS did not use commercially reasonable efforts to try to achieve COD in 2020; that IRUS slacked off; and that IRUS abused its discretion in deciding not to accelerate construction), *with* ECF No. 253 at 42-46 (updated conclusions of law focusing on abuse of discretion); *see* Tr. at 1190:9-11 (arguing in summation that "[w]hat the case is about is, why did they change the COD on September 1?  What was the basis for that decision?  It was arbitrary and irrational.").  According to Plaintiffs, Defendants acted in bad faith because, in July 2020, RWE "took over a project that was on schedule to complete COD in 2020," but, around September 1, 2020, changed its projected COD to 2021 without any explanation or support in the record.  ECF No. 253 at 43-44.

Based on the evidence presented at trial, the Court finds that Defendants did not act "arbitrarily or irrationally in exercising" their discretion under the Merger Agreement or

otherwise. *Cordero*, 211 N.E.3d at 670 (citation omitted).  As discussed above, the premise that the Cassadaga Project was consistently "on schedule" for completion in 2020 until an irrational and arbitrary decision was made in early September 2020 to change the projected COD to 2021 is belied by extensive evidence to the contrary.  From the start, developmental setbacks with National Grid's Facility Study, the wetlands permit, and the POI location compressed the time that IRUS had to complete the project in 2020, each of which was not anticipated at the time of the Merger Agreement's signing.  Construction did not begin until the winter of 2019, when delays are common.  COVID-19 soon shut down most construction for two months and further slowed progress when work resumed.  Even after implementing acceleration measures, contractors on the project suffered still more delays and quality issues until IRUS ultimately concluded that, despite its best efforts, it could not complete the project as quickly as the parties had expected.  That the project's official COD target remained 2020 for so long illustrates to the Court more that IRUS was determined to complete the project by the end of 2020 – even after the safe-harbor tax-credit extension – rather than that IRUS acted or intended in bad faith to delay and avoid a Milestone Payment to Plaintiffs.  If anything, the continued drive toward 2020 reflected the company's continued hope and desire that, despite the mounting obstacles in its path, it could complete the project by the end of 2020.  This does not show bad faith.

Plaintiffs' suggestion that RWE acted "without a sound basis in reason and without regard to relevant facts" when it ultimately determined that the COD would likely move to 2021 mischaracterizes the deliberation with which Defendants monitored Cassadaga's progress, considered ways to speed up construction, and eventually decided to adjust their timeline.  ECF No. 253 at 43.  The evidence shows that, by September 2020, the project, already on a compressed timetable for construction, had suffered delays from COVID-19 and

performance issues with JBS (including a large crack in the first foundation that it poured, behind schedule). IRUS weighed a range of acceleration options often used on other construction projects but ultimately concluded that, due to COVID-19 and subsequent supply-chain issues, those options were not available here. *See* Puterbaugh Dep. at 129:12-22, 131:1-133:16, 213:18-22. For example, IRUS considered accelerating JBS's schedule for pouring turbine foundations but decided that such measures would be unlikely to accelerate the overall schedule. *Id.* at 114:1-8. IRUS also considered options as drastic as firing JBS or hiring an additional contractor. Tr. at 956:4-18. Ultimately, however, IRUS concluded that it would have been too difficult to find another contractor that was certain to perform better than JBS in the limited time available. *Id.* IRUS opted instead to try to work with JBS, monitor it, and push the contractor to stay on course. *Id.* at 956:15-18. As Badeusz credibly testified at trial: "[I]f somebody had a silver bullet to create a solution for all the problems we encountered on that project, I would have bought it." *Id.* at 950:25-951:2. Against this backdrop, the decision to push the project's official COD to 2021 was reasoned and deliberate. Plaintiffs cannot attribute arbitrariness to a decision while ignoring the full set of experiences and analysis on which it rested. Though that decision "incidentally lessen[ed]" Plaintiffs' "expected benefit," it was not arbitrary. *Sec. Plans, Inc.*, 769 F. 3d at 817 (quotation marks and citation omitted).[5]

The project's completion in late August 2021 further cuts against the suggestion that IRUS lacked a factual basis for its decision to move the projected COD or in bad faith delayed

---

[5] Given the circumstances and issues surrounding Cassadaga's construction that were presented during the trial and in the communications between Puterbaugh and Badeusz, the Court does not agree with Plaintiffs' contention that the lack of a written cost-benefit analysis and revised integrated project-management schedule in September 2020 proves that IRUS acted arbitrarily and irrationally when it recognized that the Cassadaga Project's COD would likely push into 2021. *See* Tr. 960:2-961:5 (Badeusz testifying that fully integrated schedules are rarely used in wind-farm construction).

the project to deprive Plaintiffs of their Milestone Payment.  IRUS incurred significant costs

associated with eight additional months of construction and forewent generating any

commercial revenue on the project during that time.  *See* Tr. at 947:9-16.  Had IRUS decided

to move the project's COD to 2021 without reference to the project's actual progress on the

ground or to disadvantage Plaintiff, it likely would have completed construction shortly after

December 31, 2020.  That the Cassadaga Project did not begin commercial operations until

August 2021 suggests that there were legitimate construction reasons that delayed the

project's COD past 2020.  Plaintiffs do not square this timeline with their characterization of

IRUS's behavior.  IRUS benefitted from the Cassadaga Project only upon its completion and

Plaintiff's speculation that IRUS acted in bad faith, against its own interests in delaying the

project until August 2021, is belied by the record.  *See InspiRx, Inc. v. Lupin Atlantis*

*Holdings SA*, 554 F. Supp. 3d 542, 568 (S.D.N.Y. 2021) (declining to find that defendant

failed to market a product diligently where the defendant "only benefited from the Agreement

by actually selling the Products").

Insofar as Plaintiffs argue that IRUS acted in bad faith by "slacking off," the Court

finds no evidence that IRUS slacked off or failed to act, let alone that it did so "directly to

impair the value of the contract for" Plaintiffs.  *Bank of China v. Chan*, 937 F.2d 780, 789 (2d

Cir. 1991).  As discussed above, IRUS diligently worked throughout the project's

development and construction to minimize delays and complete the project by the end

of 2020.  At times, IRUS paid a premium to accelerate work on the project.  PX 188.  Even

after the IRS extended the safe-harbor deadline, IRUS nevertheless pressed forward in trying

to achieve COD in 2020.  IRUS pressured its contractors to accelerate their work to meet their

agreed-upon schedules – at some points threatening to withhold pay, and even collecting

liquidated damages.  PX 392 at 3; Tr. at 953:23-954:3.  None of these facts suggests that

Defendants paused their efforts upon receiving the safe-harbor extension, that they looked for excuses to delay, or that they slowed their progress to deprive Plaintiffs of the Milestone Payment. Each of IRUS's witnesses testified, credibly, that they were never told to stop, delay, or slow the pace of construction.

Insofar as Plaintiffs maintain that IRUS could have, and should have, done more to complete the Cassadaga Project by the end of 2020, this is not the test for bad faith. *See Sec. Plans, Inc.*, 769 F.3d at 817 ("A plaintiff [making an implied-covenant claim] must show substantially more than evidence that the defendant's actions were negligent or inept."); *InspiRx, Inc*, 554 F. Supp. 3d at 567-68 (declining to find that defendant acted in bad faith by failing to market a pharmaceutical product diligently where the defendant hired 120 sales representatives to market a different drug and reduced its marketing budget for the product); *Lykins*, 2018 WL 3231542, at *10 (deeming evidence that the defendant "mismanaged" a business recently acquired from the plaintiff insufficient to prove bad faith where there was "simply no evidence that [the defendant's] allegedly poor and incompetent management decisions were taken with the purpose of depriving Plaintiffs of their earn-outs" (quotation marks and citation omitted)). The Court declines to infer bad faith from Defendants' choices in navigating a difficult situation made still more difficult by the onset of a global pandemic.

In any event, Plaintiffs have not provided evidence that IRUS could have even reached COD for the Cassadaga Project in 2020 if it had done more. Plaintiffs rely on testimony from two expert witnesses – Michael Hickey and Mark Mezyk – to argue that the Cassadaga Project could have reached a 2020 COD by using standard acceleration measures. *See, e.g.*, Tr. at 449:8-14, 544:10-12. The Court does not credit this testimony in that regard.

As an initial matter, both experts have significant gaps in their experience that discount the value of their opinion on this point. Hickey has never worked on a construction

project in New York.  *Id.* at 613:12-19.  Of the projects he worked on in 2020, none was in a state that experienced a shutdown due to COVID-19 that was as long as New York's.  *Id.* at 501:20-502:12.  Hickey's wind-construction experience is also limited to work for contractors, not developers, so he likely does not have experience managing the schedule for an entire project.  *Id.* at 501:13-19.  Meanwhile, Mezyk has no experience with the construction of a wind farm, either as a contractor or as a developer.  *Id.* at 611:17-612:17.  To the extent that Mezyk has some experience in serving as an expert on other disputes involving wind-farm projects, none of those projects was in New York.  *Id.* at 613:12-19.

More fundamentally, neither Hickey nor Mezyk testified that the Cassadaga Project could have achieved a COD in 2020.  Hickey assumed, without further analysis, that those "common acceleration techniques could have been employed here on the Cassadaga project." Tr. at 496:15-21; *see id.* at 492:17-23.  Hickey testified that acceleration measures such as adding more workers "could potentially have been applied," but he acknowledged that more analysis was needed to determine if the measures "could actually have been applied."  *Id.* at 499:9-19.  Mezyk, for his part, conceded that implementing his proposed acceleration measures would not have guaranteed the Cassadaga Project's COD by the end of 2020.  *Id.* at 641:20-642:3.  Mezyk could not point to another construction project in New York during the COVID-19 pandemic that was able to, as he suggested, double the number of workers or equipment to accelerate the project's completion.  *Id.* at 625:5-25.  Nor did he consider the challenges that COVID-19 presented at the Cassadaga site, such as the workers who tested positive or the COVID-19 protocols adopted by several contractors and subcontractors.  *Id.* at 617:5-13, 619:3-620:9, 627:7-22.  Neither expert took any steps to determine whether the labor or equipment arguably needed to complete Cassadaga within 2020 was available, especially in light of COVID-19's impact.  *Id.* at 490:4-24, 623:22-625:4, 632:13-633:12.

41

Without further analysis of the availability of additional labor and equipment during this time, the Court does not credit the assertion that, had IRUS hired more workers or staffed them for longer hours (assuming that it could get the requisite approvals under its Article 10 permit to do so), it might have achieved COD in 2020. Instead, the Court credits the testimony of those who actually worked on the Cassadaga Project, with experience in wind-farm development and construction, and who testified to the various reasons why a COD in 2020 was not attainable.

Plaintiffs' reliance on the IRS's extension of the safe-harbor tax-credit deadline, which allegedly reduced IRUS's incentives under the Merger Agreement to complete the Cassadaga Project by 2020, does not support a finding of bad faith either. That the renewable-energy industry group lobbied for and obtained an extension of the tax-credit safe harbor amid an unprecedented global pandemic does not constitute bad faith on IRUS's part, even if the parties did not anticipate this extension when they entered into the Merger Agreement. *See Sec. Plans, Inc.*, 769 F.3d at 817 (implied covenant does not "undermine a party's general right to act on its own interests in a way that may incidentally lessen the other party's expected benefit" (quotation marks and citation omitted)). And the Court does not see any evidence that IRUS paused, slowed, or stopped construction efforts on the Cassadaga Project after the safe-harbor extension was granted; on the contrary, the evidence supports the Court's finding that IRUS continued to diligently work toward a 2020 COD after the safe-harbor extension. Defendants testified credibly that they had strategic goals surrounding a 2020 COD and used their best efforts to meet those goals.

The December Milestone was tied to a certain date, not to the receipt of tax credits. Though it may have been advantageous in retrospect for Plaintiffs to have negotiated for different milestone triggers (and it appears as if Spencer wishes that he had), the December

Milestone as written in the Merger Agreement is the bargain for which the parties contracted. That Defendants were not bound to make the Milestone Payment despite receiving an extra year to qualify for the tax-credit safe harbor does not "violate the party's presumed intentions or reasonable expectations." *Spinelli*, 903 F.3d at 205 (quotation marks and citation omitted); *see Butvin v. DoubleClick, Inc.*, No. 99-cv-04727 (JFK), 2001 WL 228121, at *9 (S.D.N.Y. Mar. 7, 2001) (observing that a plaintiff who was fired before his stock options vested "might feel ill-used but he cannot argue that he had been deprived of anything to which he was entitled"), *aff'd*, 22 F. App'x 57 (2d Cir. 2021) (summary order).[6]

To the extent that Plaintiffs claim that IRUS did not undertake commercially reasonable efforts to achieve COD by 2020, their argument is misplaced. The Merger Agreement at Section 7.6(a) required IRUS to "use commercially reasonable efforts . . . to *develop* the [Cassadaga Project]" (emphasis omitted). Annex 2, which Section 7.6(a) references, describes the standards of care for various tasks, all associated with development: IRUS was to "[m]aintain land to support required project facilities," "[m]aintain [its] queue position" on the New York Independent System Operator's list of proposed energy projects seeking to join the power grid, "[c]ontinue [the] Article 10 permitting process" to receive state approval for the project's construction, and "[m]aintain [the project's] existing [power purchase agreements] in good standing." Agreement § Annex 2. None of these goals concerns the construction of the Cassadaga Project. Missing from Section 7.6(a) is any language requiring IRUS to take steps to *construct* the project or pursue a 2020 COD in line

---

[6] Although Plaintiffs no longer seem to make the argument, the Court does not find evidence of bad faith from IRUS's early financial analyses noting that it would not owe a Milestone Payment if the Cassadaga Project failed to reach COD in 2020. IRUS behaved as a reasonably prudent corporation in considering the various scenarios and weighing its options under the Merger Agreement.

with a commercially reasonable standard of care.  *See* Tr. at 172:9-173:8, 322:2-25.  To

conclude otherwise would "create duties . . . not fairly inferable" from the terms of the Merger

Agreement.  *Kitchen Winners*, 2023 WL 2746031, at *14 (citation omitted).[7]

      Even if there were such a requirement, though, the Court finds, for the reasons

previously stated, that IRUS's efforts in constructing the Cassadaga Project were

commercially reasonable.  The Court credits the testimony of IRUS's witnesses and finds that

IRUS worked diligently to attempt to achieve COD by 2020.  Plaintiffs have not presented

credible evidence (through their experts or otherwise) of a commercially reasonable efforts

standard for the Cassadaga Project's construction that IRUS did not meet.  *See Holland*

*Loader Co. v. FLSmidth A/S*, 313 F. Supp. 3d 447, 472 (S.D.N.Y. 2018) ("When the term

'commercially reasonable efforts' is not defined by the contract, courts in this district require

the party seeking to enforce the efforts provision to establish the objective standard by which

the breaching party's efforts are to be judged, in the context of the particular industry."), *aff'd*,

769 F. App'x 40 (2d Cir. 2019) (summary order); *Sekisui Am. Corp. v. Hart*, 15 F. Supp. 3d

359, 381 (S.D.N.Y. 2014) (finding no evidence establishing objective standard for

"commercially reasonable efforts" in FDA-regulatory context).

---

[7] Plaintiffs' attempt to graft a commercially-reasonable-efforts requirement from
Section 7.6(a) onto IRUS's construction obligations with respect to the December Milestone
conflicts not only with the text of the Merger Agreement but also with their litigation stance
taken at an earlier stage of this case.  In its previous opinion on Defendants' motion to
dismiss, the Court declined to dismiss Plaintiffs' claim for breach of the implied covenant as
duplicative of their claim for breach of contract.  *See Trireme*, 2021 WL 3668092, at *5-8.  In
doing so, however, the Court noted that "Plaintiffs are now bound by their litigation strategy
adopted in response to Defendants' motion," such that even if Innogy's decision to push COD
to 2021 was a product of "conduct that might violate a commercially reasonable efforts clause
but does not support the conclusion that Innogy acted in bad faith, Plaintiffs may not pivot to
pursuing that conduct as part of their breach of contract claim."  *Id.* at *8 n.6.

The Court is not persuaded by Plaintiffs' reliance on *Capax Discovery, Inc. v. AEP RSD Investors., LLC*, No. 17-cv-00500, 2021 WL 3909857 (W.D.N.Y. Sept. 1, 2021), *aff'd sub nom. Baiocco v. AEP RSD Invs., LLC*, No. 21-2475, 2022 WL 2902081 (2d Cir. July 22, 2022) (summary order). There, the court found a breach of the implied covenant of good faith and fair dealing, concluding that the defendant had "intentionally delayed" payments to the plaintiff "in bad faith in order to reduce the amount of" the earn-out payment owed. *Id.* at *10. Here, however, the Court finds no evidence, either direct or by inference, that Defendants delayed construction of the Cassadaga Project to deprive Plaintiffs of the Milestone Payment. Whereas the defendant in *Capax* had "no legitimate business reason for delaying payment," *id.* at *7, several legitimate reasons (as described above) delayed Defendants' commercial operation of the Cassadaga Project past 2020. The Court does not infer an intent to delay from Defendants' response to these setbacks. *See, e.g.*, *Wagner v. JP Morgan Chase Bank*, No. 06-cv-03126 (RJS), 2011 WL 856262, at *4-5 (S.D.N.Y. Mar. 9, 2011) (evidence that the defendant failed to fund research and development, imposed hiring freezes and cost-cutting measures, fired key personnel, closed an important office, and eliminated software development work did not show "that Defendant's management decisions were intended to deprive Plaintiffs of the earn-out payments"); *Keene Corp. v. Bogan*, No. 88-cv-00217 (MBM), 1990 WL 1864, at *14-15 (S.D.N.Y. Jan. 11, 1990) (evidence of the defendant's alleged mismanagement – including poor quality control, misguided pricing policies, the shipment of defective parts, a failure to adhere to contract delivery schedules, and a failure to adopt the opinions of veteran employees on the business – did not support an inference of bad faith where the plaintiff had not shown that the defendant "adopted these policies with the purpose of or [in] reckless disregard for losing money"); *Fireman v. News Am. Mktg. In-Store. Inc.*, No. 05-11740, 2009 WL 3080716, at *11 (D. Mass. Sept. 26, 2009)

(applying New York law and rejecting implied-covenant claim where defendant's decisions to rebrand the company acquired from plaintiff and to reorganize its core team "[a]t most . . . show[ed] strategic disputes between sophisticated businesspeople as to how [the company] should have been run").

For all of these reasons, having reviewed the evidence in light of the applicable law, the Court does not find that Plaintiff has proven that IRUS breached the implied covenant of good faith and fair dealing by delaying the construction of the Cassadaga Project to deprive Plaintiffs of the December Milestone.

## II.   Breach of Contract Under Section 7.6(b)

Section 7.6(b) provides that IRUS "shall keep [Plaintiffs] informed on a reasonable, periodic basis, but no less frequently than quarterly, regarding the development of [the Cassadaga Project], by delivering information" in an agreed-upon form to "an individual appointed by [Plaintiffs], who shall initially be James Spencer."  Agreement § 7.6(b).  The section adds that IRUS "shall also reasonably cooperate with [Spencer] to respond to [his] reasonable ad-hoc inquiries regarding the development of [the Cassadaga Project]; provided, however, [Spencer] shall limit such inquiries to a reasonable level, taking into account the stage of development of the applicable Key Project."  *Id.*

Under its breach-of-contract claim, Trireme asserts that IRUS breached Section 7.6(b) of the Merger Agreement by failing to provide a timely update on the Cassadaga Project's development for the second quarter of 2020 and by failing to timely respond to James Spencer's inquiries about Cassadaga between April 1, 2020, and September 18, 2020. Trireme seeks damages in the amount of the December Milestone: $69.7 million.  SAC ¶ 157.

### A.  Legal Standard

Under New York law, the elements of a claim for breach of contract are (1) the

existence of an agreement; (2) adequate performance of the contract by the plaintiff; (3)

breach of contract by the defendant; and (4) damages. *34-06 73, LLC v. Seneca Ins. Co.*, 198

N.E.3d 1282, 1287 (N.Y. 2022); *Eternity Glob. Master Fund Ltd. v. Morgan Guar. Tr. Co. of

N.Y.*, 375 F.3d 168, 177 (2d Cir. 2004).   The parties do not dispute the first two elements of

Trireme's claim: the Merger Agreement is a valid, enforceable agreement, and Trireme

performed its contractual obligations by transferring its projects under development to IRUS.

The Court finds, however, that Plaintiffs have not shown a breach of Section 7.6(b) or that

damages resulted from that breach.

        Under New York law, courts are to give the "words and phrases in a contract . . .  their

plain meaning" and construe the contract "so as to give full meaning and effect to all of its

provisions."  *Chesapeake Energy Corp. v. Bank of N.Y. Mellon Tr. Co.*, 773 F.3d 110, 114 (2d

Cir. 2014) (alterations adopted and citation omitted).   "Only where a contract's terms are

ambiguous can extrinsic evidence be used to aid interpretation."  *Tang Cap. Partners, LP v.

BRC Inc.*, --- F. Supp. 3d ----, 2023 WL 2396635, at *7 (S.D.N.Y. Mar. 8, 2023).   However,

contract terms are ambiguous if they "could suggest more than one meaning when viewed

objectively by a reasonably intelligent person who has examined the context of the entire

integrated agreement and who is cognizant of the customs, practices, usages and terminology

as generally understood in the particular trade or business."  *Id.* (quoting *Law Debenture Tr.

Co. of N.Y. v. Maverick Tube Corp.*, 595 F.3d 458, 466 (2d Cir. 2010)).   "Evidence as to such

custom and usage is to be considered by the court where necessary to understand the context

in which the parties have used terms that are specialized [and] the court must be informed of

the meaning of the language as generally understood in that business, in the light of the

customs and practices of the business."  *Id.* (quoting *Law Debenture Tr. Co. of N.Y.*, 595 F.3d

at 466).   "Proof of custom and usage does not mean proof of the parties' subjective intent" but

rather serves as "proof that the language in question is fixed and invariable in the industry in question." *Law Debenture Tr. Co. of N.Y.*, 595 F.3d at 466 (quotation marks and citation omitted).

Under New York law, "[c]ausation is an essential element of damages" for breach-of-contract claims. *Nat'l Mkt. Share, Inc.*, 392 F.3d at 525. "[A] plaintiff must prove that a defendant's breach directly and proximately caused his or her damages." *Id.* Damages must be "directly traceable to the breach, not remote or the result of other intervening causes." *Wilder v. World of Boxing LLC*, 310 F. Supp. 3d 426, 445 (S.D.N.Y. 2018) (citation omitted), *aff'd*, 777 F. App'x 531 (2d Cir. 2019) (summary order). "Where a party has failed to come forward with evidence sufficient to demonstrate damages flowing from the breach alleged and relies, instead, on wholly speculative theories of damages," the breach-of-contract claim fails. *Id.* at 446 (citation omitted). A breach need not be the sole cause of a party's damages, but must be a "substantial factor" such that it "would be thought of by people generally as having operated to an important extent in producing the harmful result." *Coastal Power Int'l, Ltd. v. Transcontinental Cap. Corp.*, 10 F. Supp. 2d 345, 366 (S.D.N.Y. 1998) (citations omitted), *aff'd*, 182 F.3d 163 (2d Cir. 1999).

## B. Breach

As discussed above, Section 7.6(b) of the Merger Agreement required IRUS to provide quarterly development updates to Trireme, and to respond to "reasonable ad-hoc inquiries" from James Spencer regarding the development of the projects. Agreement § 7.6(b). On March 31, 2020, IRUS emailed a quarterly development report to Spencer, who responded the next day with a request for additional information on the status of construction at Cassadaga. PX 233. An IRUS employee responded that the project was "on track for a Q4 2020 COD" but that "the rapidly evolving COVID-19 situation in New York may result in a

temporary shutdown of our construction activities at Cassadaga." *Id.* at 1.  The IRUS

employee further responded that "[t]his is a dynamic situation" and that he would provide

"info on the construction status." *Id.*  Spencer sent an additional request for information on

May 19, 2020, seeking information as to interconnection costs, power purchase agreements,

and IRUS's "current expectation" for the Cassadaga Project's COD as reflected in a current

construction schedule.  PX 281; PX 281A.  On June 8, 2020, Trireme's outside counsel gave

notice to IRUS of a potential breach of the Merger Agreement, noting Trireme's concern that

IRUS was "intentionally delaying the Project to evade making the Payment Milestone

Amount" and that IRUS had ignored Spencer's recent requests for information.  PX 293 at 2-

3.  IRUS's outside counsel responded on June 22, 2020, denying Trireme's characterization of

IRUS's conduct in progressing the project and stating that IRUS was "preparing responses to

Mr. Spencer's inquiries, and intends to respond to Mr. Spencer soon."  PX 306 at 4.  When

Spencer did not receive a response, he pressed again on September 1, 2020, asking about

IRUS's "current expectation" for the Cassadaga Project's COD.  PX 399.  On September 18,

IRUS sent Spencer a report for the second quarter of 2020 with updates on six projects,

including Cassadaga, which had been finalized by July 2, 2020, but had inadvertently not been

sent.  PX 415.  On September 26, 2020, IRUS informed Spencer that the project's estimated

COD had changed to March 5, 2021.  PX 426.

As for the ad hoc requests, IRUS was not untimely in its responses because the Merger

Agreement does not set a deadline for responding to Spencer's ad hoc requests, and IRUS did

ultimately respond to the requests.  A dialogue existed between the parties, with responses

from IRUS and its outside counsel on April 1, 2020, and June 22, 2020.  However, IRUS's Q2

2020 development report, with updates on numerous Key Projects, was delayed until

September 2020.

Even if responses were untimely, IRUS committed no breach of the Merger Agreement as to the provision of any untimely construction information because Section 7.6(b) required IRUS only to respond to ad hoc inquiries "regarding the *development* of [the Cassadaga Project]" and to "keep [Plaintiffs] informed on a reasonable, periodic basis, but no less frequently than quarterly, regarding the *development* of each Key Project." Agreement § 7.6(b) (emphasis added).  The quarterly update requirement was about the "development of" the Key Projects.  *Id.*  By the time of Spencer's first inquiry in April 2020, the Cassadaga Project had finished development and started construction.  Testimony from the parties' witnesses confirmed that, at least within the wind-energy industry, "development" and "construction" have "fixed and invariable" meanings.  *Law Debenture Tr. Co. of N.Y.*, 595 F.3d at 466 (citation omitted).  While "development" consists of the work involved prior to the physical construction of the project, "construction" refers to the actual building of the project. *See, e.g.*, Young Dep. at 110:7-16; Tr. at 168:15-169:3.  Because Spencer's requests were for information on the Cassadaga Project's construction, not its development, IRUS did not breach Section 7.6(b) by failing to provide information on that subject as quickly as Spencer would have liked.  Similarly, because development on the Cassadaga Project had been completed by June 30, 2020, the Q2 2020 development report – which primarily included development updates on other Key Projects – was not required, and therefore not untimely, under the Merger Agreement.

### C. Damages

Even if Defendants had breached Section 7.6(b) by failing to timely provide the requested information to Spencer, the Court finds no damages "directly traceable" to this breach. *Wilder*, 310 F. Supp. 3d at 445 (citation omitted).  Trireme argues that, had it received the requested information promptly, it could have taken steps to ensure that Cassadaga achieved

COD in 2020, such as by talking through the delays with IRUS, assessing acceleration measures, and considering options for mitigation.  Tr. at 148:7-25.  Plaintiffs also suggest that they could have negotiated with IRUS to restructure the earnout payment to make acceleration economically viable and thereby avoid a total loss of the Milestone Payment.  *Id.* at 148:22.

The Court does not agree.  Trireme did not lack any timely information that caused it damage. IRUS told Trireme in April 2020 that Cassadaga's construction was a "dynamic situation" due to the COVID-19 pandemic and potential shutdowns.  Terra Firma's internal documents also show that, during this time, Plaintiffs were aware of the pandemic's impact and assessed Cassadaga's probability of obtaining COD in 2020 at 0%.  DX 259 at 3.  This document acknowledged that the Cassadaga Project "is expected to be delayed beyond this date [of December 31, 2020] in [the] current environment."  *Id.* at 6.  In other words, Trireme already understood that the project was expected to be delayed beyond 2020 regardless of any update from IRUS.  Despite this knowledge, Plaintiffs did not take any actions to assess acceleration measures or renegotiate the Merger Agreement.

Indeed, Trireme's arguments rely "on wholly speculative theories of damages" that do not connect the damage alleged – the loss of the Milestone Payments – with a breach under Section 7.6(b).  *Wilder*, 310 F. Supp. 3d at 446 (citation omitted).  Trireme does not clarify what steps it would have taken to speed up construction had it known more particulars of the project's status.  Nor is there evidence from which the Court concludes that Trireme could have done anything to accelerate the process.  Trireme does not point to any issue raised in the quarterly development report that it could have addressed had it received the report in July 2020 instead of in September 2020.  Indeed, earlier receipt would not have even confirmed IRUS's projected COD of 2021 for Cassadaga, which IRUS did not revise until later in September 2020.

At bottom, Trireme was not injured by any purported informational breach of

Section 7.6(b); rather, Trireme did not receive the Milestone Payment because the Cassadaga Project was not built until after 2020.   Plaintiffs have failed to show that IRUS's lack of responsiveness was a "substantial factor" in causing the project to miss the December Milestone.  *Coastal Power Int'l, Ltd.*, 10 F. Supp. 2d at 366 (citation omitted).

Therefore, Plaintiffs' breach-of-contract claim fails.

## III.   Joint and Several Liability Under the Parent Guarantee

Under the Parent Guarantee, Innogy "irrevocably and unconditionally guarantees  . . . the payment when due of [IRUS's] payment obligations arising under the [Merger Agreement] Contract."  Guarantee § 2.1.  However, Innogy has no such liability obligations in this case to guarantee.  Based on the Court's finding that IRUS did not breach the Merger Agreement directly or indirectly – and therefore owes Trireme no Milestone Payment – the Court grants judgment in favor of Defendants as to Plaintiffs' request for a declaratory judgment that Innogy is jointly and severally liable under the Parent Guarantee.

## CONCLUSION

When they negotiated the Merger Agreement in 2017, the parties did not anticipate that nearly four years would pass before the Cassadaga Project began generating power in western New York.  Based on the evidence presented, this delay is not because one party tried, in bad faith, to cheat the other out of $69.7 million.  It is instead the unfortunate result of a project plagued by delays from the start.  Setbacks from before the Merger Agreement closed led to a tight construction schedule; a global pandemic that neither party anticipated compressed that schedule further; and construction delays and contractor issues combined with those factors to push the project's completion well into 2021.  Disappointing, yes; bad faith, no.

For the reasons set forth herein, the Court concludes that Plaintiffs have failed to prove that IRUS breached the Merger Agreement's implied covenant of good faith and fair dealing. The Court also finds no breach of the parties' contract as to IRUS's reporting requirements. Therefore, the Court enters judgment in favor of Defendants on Plaintiffs' implied-covenant and breach-of-contract claims, as well as on Plaintiffs' related claim for a declaratory judgment regarding the Parent Guarantee.

The Clerk of Court is respectfully directed to close the case.

Dated: December 14, 2023
New York, New York

SO ORDERED.

JENNIFER L. ROCHON
United States District Judge